STATE of Missouri, Respondent,

v.

Vincent McFADDEN, Appellant.

No. SC 87753.

Supreme Court of Missouri,
En Banc.

March 20, 2007.

Janet M. Thompson, Office of Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Daniel N. McPherson, Asst. Atty. Gen., Jefferson City, for Respondent.

PER CURIAM.

## I.

A jury convicted Vincent McFadden of first-degree murder, armed criminal action, and witness tampering. McFadden was given the death penalty consistent with the jury's recommendation. This Court has exclusive jurisdiction pursuant to Mo. Const. art. V, sec. 3. Among his fourteen points of error, McFadden raises valid challenges under *Batson v. Kentucky* and *Johnson v. Mississippi.* The judgment is reversed, and the case is remanded.

## II.

■ The facts, which this Court reviews in the light most favorable to the verdict,[1] indicate that, on May 15, 2003, McFadden shot and killed Leslie Addison and threatened Leslie's sister, Eva, so that Eva would not testify against McFadden.

At trial, the State exercised five of its nine peremptory strikes to remove one Asian and four African–American venirepersons. The only remaining African–American was removed for hardship, leaving McFadden with an all-white jury. Defense counsel challenged the strikes under

---

1.  *State v. Taylor,* 134 S.W.3d 21, 24 (Mo. banc 2004).

*Batson v. Kentucky.*[2] The State attempted to justify the strikes with race-neutral explanations, which defense counsel argued were pretextual. The trial court denied McFadden's *Batson* claims. The jury found McFadden guilty of all charges.

During the penalty phase, the State introduced evidence of McFadden's convictions and death sentence in an unrelated case as aggravating factors supporting capital punishment in this case. The jury cited the earlier convictions as statutory aggravators and recommended a sentence of death. On May 16, 2006, this Court reversed those earlier convictions in *State v. McFadden (McFadden I )*.[3] On May 24, 2006, the trial court in the present case sentenced McFadden to death plus 82 years imprisonment.

### III.

■ This Court elaborated on the principles of *Batson* and its progeny in *McFadden I.* To summarize, racial discrimination in jury selection violates the Equal Protection Clause of the Constitution of the United States.[4]

■ A defendant can establish a *prima facie* case of discriminatory jury selection by "the totality of the relevant facts" of the prosecutor's behavior during the defendant's trial.[5] When the State provides a race-neutral reason for exercising a peremptory strike that is more than an unsubstantiated denial of discriminatory purpose, the defense must show that the State's explanation is pretextual and the true reason for the strike is racial.[6] The trial court's findings on a *Batson* challenge will be set aside if they are clearly erroneous, meaning the reviewing court is left with the definite and firm conviction that a mistake has been made.[7] This Court has such a conviction here.

■ McFadden challenges on *Batson* grounds the State's exercise of peremptory strikes to remove two African–American women from the jury pool. The State claimed to remove venireperson D.C. because she participated in her church choir's annual Christmas concert at a local prison workhouse. The State claimed to remove venireperson S.H. because she did not have a driver's license, she had "crazy red hair," and she seemed hostile. The Court finds a clear *Batson* violation in the State's removal of S.H. for having red hair. This being dispositive, the Court does not opine on the removal of D.C.

The trial court rejected the State's justification for removing S.H. for not having a driver's license and for seeming hostile. The court found the lack of driver's license irrelevant and perceived that S.H. was not hostile but merely exasperated by the State's interrogation concerning the license. In response to the State's justifica-

---

**2.** 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). As this Court cautioned in *McFadden I*, "racial discrimination in jury selection compromises the defendant's right to a trial by an impartial jury." Citing *Miller–El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 2323, 162 L.Ed.2d 196 (2005).

**3.** *State v. McFadden*, 191 S.W.3d 648 (Mo. banc 2006).

**4.** *Strauder v. State*, 100 U.S. [Otto] at 308, 25 L.Ed. 664; *Miller–El*, 125 S.Ct. at 2324; *State v. Edwards*, 116 S.W.3d 511, 524 (Mo. banc 2003); *State v. Brown*, 958 S.W.2d 553, 553 (Mo. banc 1997); *State v. Parker*, 836 S.W.2d 930, 933 (Mo. banc 1992).

**5.** *Batson*, 476 U.S. at 94, 106 S.Ct. 1712. See also *Miller–El*, 125 S.Ct. at 2324; *Parker*, 836 S.W.2d at 933; *State v. Antwine*, 743 S.W.2d 51, 64 (Mo. banc 1987).

**6.** *Parker* at 939.

**7.** *Edwards*, 116 S.W.3d at 525; *Antwine*, 743 S.W.2d at 66.

tion for removal of S.H. because of her bright red hair,[8] defense counsel explained that S.H.'s hair color, though perhaps uncommon among the prosecutor's acquaintances, was quite fashionable in the African–American community. The trial court, sharing the prosecution's unfamiliarity, agreed that the look "[made] her separate from the crowd, and very individualistic" and allowed the strike.

■ Normally, evidence of discrimination is established when the State's reason for striking an African–American venireperson applies to an otherwise-similar member of another race who is permitted to serve.[9] It does not appear that there was a white juror with distinctive hair, but an identical comparison is not necessary. "A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable."[10] In evaluating pretext, a trial court considers whether the explanation is (1) race-neutral, (2) related to the case to be tried, (3) clear and reasonably specific, and (4) legitimate.[11] The trial court's "chief consideration should be the plausibility of the prosecutor's explanations in light of the totality of the facts and circumstances surrounding the case."[12]

■ Applying the foregoing factors, first, whether the State's explanation is race-neutral to begin with is dubious. The State relies on *State v. Williams*,[13] where the prosecutor exercised a peremptory strike to remove an African–American venireperson whose "earrings and clothing indicated that he was 'trying to be different' and was 'liberal.' "[14] This Court rejected that *Batson* challenge, finding that "striking a prospective juror based upon clothing and attire does not reflect an inherent racial bias."[15] Here, however, defense counsel refuted the State's conclusion that S.H.'s hair color was crazy and noted that S.H. was neatly dressed. The Court acknowledges that peremptory strikes are subjective, and great reliance is placed on the trial court's assessment of the legitimacy of the State's explanation.[16] In this case, however, the record suggests that the trial judge was initially inclined to sustain McFadden's *Batson* challenges but then retreated. The Court's deference to the trial court is not without limits. Viewing the totality of circumstances—the prosecution's disdain for S.H.'s red hair, his scrutiny of her lack of driver's license, and his misperception of her reaction as hostile—the prosecution's subjective assumptions about S.H. are far from neutral.[17]

**8.** The State elaborated on the hair color describing it as "Ronald McDonald's hair. It looked like clown red hair. It tended more towards the orange side."

**9.** *Miller–El,* 125 S.Ct. at 2325; *Edwards,* 116 S.W.3d at 525; *Antwine,* 743 S.W.2d at 65.

**10.** *Miller–El,* 125 S.Ct. at 2329, n. 6.

**11.** *Edwards,* 116 S.W.3d at 511.

**12.** *Parker,* 836 S.W.2d at 939. See also *Miller–El,* 125 S.Ct. at 2331; *Edwards,* 116 S.W.3d at 527; *Antwine,* 743 S.W.2d at 64.

**13.** 97 S.W.3d 462 (Mo. banc 2003).

**14.** *Williams,* 97 S.W.3d at 471.

**15.** *Id.*

**16.** *State v. Morrow,* 968 S.W.2d 100, 114 (Mo. banc.1998).

**17.** In further regard to the prosecution's claim that S.H. was hostile, in *McFadden I* this Court noted that "vague references to attributes like demeanor 'are largely irrelevant to one's ability to serve as a juror and expose venirepersons to peremptory strikes for no real reason except for their race.' Accordingly, such vague references are heavily scrutinized." (Citing *Edwards,* 116 S.W.3d at 550 (Teitelman, J., concurring).)

Second, the State fails to articulate how S.H.'s red hair, even if it were as unusual as the prosecution found it, was related to the case other than another conclusional inference that S.H. was individualistic. Here again, the State and the trial court presume to identify difference from a limited cultural view. "[P]otential jurors are not products of a set of cookie cutters,"[18] nor should they be. Third, the State's explanation was clear and specific, to wit, "crazy-looking red hair," which renders clear the analysis of the fourth and fatal factor, legitimacy. The State's justification for removing S.H. because of her hair color is not legitimate. In light of the totality of facts and circumstances, the Court finds the prosecution's explanations implausible and merely a pretext to exercise a peremptory strike for racially discriminatory reasons. The trial court's denial of the McFadden's *Batson* challenge was clearly erroneous.

## IV.

McFadden also asserts that the trial court erred in denying his motion for a new trial and sentencing him to death because the jury's penalty recommendation was based partially on McFadden's convictions and death sentence in an unrelated case that this Court reversed (*McFadden I*). As this issue may arise on retrial because the State argues the evidence is admissible as unadjudicated prior bad acts, it is necessary to address the issue in this case.

In April 2005, McFadden was convicted of murder and armed criminal action and received the death penalty in connection with the shooting death of Todd Franklin. In the present case, tried in March 2006, the State introduced McFadden's convictions in the Franklin case as two of six aggravating factors for the jury to consider in deciding punishment. On May 16, 2006, this Court issued its opinion in *McFadden I,* where it reversed and remanded the Franklin case, thereby vacating McFadden's convictions for murder and armed criminal action, as a result of five *Batson* violations by the same prosecutor who tried the present case. Despite this Court's reversal of the Franklin convictions, which constituted one-third of the jury's basis for recommending death in the present case, on May 24, the trial court followed the jury's recommendation and sentenced McFadden to death. Because the jury's recommendation in this case was based partly on factors that this Court nullified, the sentence cannot stand.

In *Johnson v. Mississippi,*[19] the United States Supreme Court held that the reversal of a prior conviction that the jury considered in imposing the death penalty undermines the validity of the sentence. During sentencing in that case, the prosecution introduced evidence of the defendant's prior felony conviction to persuade the jury to impose a death sentence, but the prior conviction was later vacated. The Supreme Court explained that "the reversal of the conviction deprive[d] the prosecutor's ... evidence of any relevance to Mississippi's sentencing decision."[20] The decision to impose death cannot be based on factors irrelevant to the sentencing process.[21]

This Court examined the effect of a reversed prior conviction in *State v. Sto-*

**18.** *Miller–El,* 125 S.Ct. at 2329, n. 6.

**19.** 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988).

**20.** *Johnson,* 486 U.S. at 585, 108 S.Ct. 1981.

**21.** *Id.*

*rey.*[22] There, a prior conviction was used to impeach the defendant's credibility during the guilt phase of the trial. The conviction was subsequently reversed. The State conceded error. This Court held that the error was harmless because, among other reasons, the references were brief and not an attempt to develop a theme. Here, in contrast, the State's evidence during the penalty phase regarding McFadden's prior convictions and death sentence was voluminous, narrated in detail by witness testimony, and illustrated by over a dozen exhibits.

The State argues that *Johnson* does not mandate reversal here because, even if the Franklin *convictions* cannot now be used as statutory aggravators, the underlying Franklin *facts* presented by the State still carry weight as unadjudicated prior bad acts, i.e., *non-statutory aggravating circumstances.* The State cites *Brown v. Sanders*[23] in which the United States Supreme Court explained:

> [A]n invalidated sentencing factor … will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale … *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances.[24] (emphasis in original)

The Court rejects the State's implication that the Franklin convictions and death sentence were not critical to the jury's decision-making process. Of the six statutory factors on which the jury based its death penalty recommendation, only the two relating to the Franklin case involved a homicide. The other four involved assault and armed criminal action. The State implies that the jury's recommendation would have been the same based on these four weaker remaining factors. "[W]hen the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale."[25] In *Brown,* the Supreme Court cautioned that "such skewing will occur, and give rise to constitutional error, only where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor."[26] The State notes that the jury is not instructed to weigh statutory aggravators more heavily than non-statutory aggravators. But even if the prosecution's evidence regarding the underlying facts of the Franklin homicide was properly admissible under the rubric of non-statutory aggravating prior bad acts, the Court cannot assume that the jury's weighing process and sense of responsibility were unaffected by its knowledge that McFadden was already sentenced to death. A sentence resting on factors this Court deems invalid is equally invalid.

### V.

Because the foregoing claims are dispositive, it is not necessary to address the remaining grounds for appeal. The judgment is reversed and the case is remanded.

WOLFF, C.J., LAURA DENVIR STITH, TEITELMAN, RUSSELL and WHITE, JJ., concur; LIMBAUGH, J.,

**22.** 986 S.W.2d 462 (Mo. banc 1999).

**23.** 546 U.S. 212, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006).

**24.** *Brown v. Sanders,* 126 S.Ct. at 892.

**25.** *Id.* citing *Stringer v. Black,* 503 U.S. 222, 232, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992).

**26.** *Brown v. Sanders,* 126 S.Ct. at 892.

concurs in part and dissents in part in separate opinion filed; PRICE, J., concurs in opinion of LIMBAUGH, J.

STEPHEN N. LIMBAUGH, JR., Judge, concurring in part and dissenting in part.

I respectfully dissent from that part of the majority opinion addressing the *Batson* challenge.

The record does not support the majority's holding that "the prosecutor's explanations [were] implausible and merely pretext to exercise a peremptory strike for racially discriminatory reasons." So there is no mistake or misperception about the facts, it is necessary to include a full account of the exchange that transpired among the prosecutor, defense counsel and judge. When the prosecutor struck venireperson S.H., defense counsel identified her as an African–American female and challenged the prosecutor's peremptory strike as being made on the basis of race. The prosecutor then explained his reasons for striking S.H. as follows:

Well, the first thing that anybody noticed about [S.H.], Juror Number 33, is her crazy-looking hair. It is a red—a color of red brighter than the ink that comes out of a red pen or a marker. I'm not sure if it's a wig or it's her real hair.

She also doesn't have a driver's license, the only one in the panel who doesn't have a physical reason for not having a driver's license.

And her demeanor, especially in the death qualification, appeared to me to be hostile to the—at least to the process, if not to me personally, with her arm folded. I noticed as I was standing directly in front of her at one point her eyes were closed. I don't know for sure if she was sleeping, but she seemed completely disinterested in the process of

death qualification, at least for part of my jury selection and death qualification.

She was very weak on the death penalty. She hesitated in her responses regarding the death penalty before she would answer on more than once, [sic] especially when I questioned her about signing the death verdict and she indicated that she would be able to consider that punishment. I believe from her demeanor, and her answers, that she was lying to me. That she would not, in fact, ever consider the death sentence under any circumstance, nor would she ever put herself in a position to where she would require—be required to sign a death verdict or announce that verdict in open court.

The trial court then found this explanation to be race-neutral.

At that point, defense counsel questioned whether S.H.'s hair color was relevant and speculated that S.H. could have been wearing a wig after going through chemotherapy. Counsel also argued that several women in the African–American community have their hair dyed that color as a fashion statement. Counsel also argued that the lack of a driver's license is not relevant, and she noted that several of her relatives did not have licenses. Counsel also stated that the prosecutor never made a record about S.H.'s demeanor, and that the bailiffs told her that they did not see S.H. sleeping or inattentive. Counsel also said that S.H. never indicated any hesitation on the death penalty.

The prosecutor responded:

Well, with regard to what defense counsel has stated, even by defense counsel's own admission, this crazy red hair is at least some sort of statement. And she's obviously trying to set herself apart from the crowd. I don't need somebody with—that has some sort of

weird or crazy attitude towards her appearance to be getting back in the jury.

These jurors have to come to a unanimous verdict. She's obviously setting herself apart from the crowd, for whatever reason, in a very open and notorious way. There's no similarly situated juror that has a crazy appearance, other than what—I would call him a goofball that was struck for cause that had a shaved head and ZZ Top beard, and tattoos on his head. I would have struck him, too, if he made it through, because he's obviously making a statement, too.

She is obviously not invested in the community if she doesn't even have a driver's license. What kind of identification does she have? That's my thought.

That's not the major thing. It's the crazy red hair. I found that her demeanor was hostile. And I'm not really concerned with what bailiffs or defense attorneys think. That's for the defense attorney to make their determination about how they view these jurors.

I know for a fact, as I stood in front of her during death qualifications, her eyes were closed. Now, I may have been really boring, she may have been thinking real hard, but I got the impression she wasn't listening to me. And I don't like when somebody is not going to listen to death qualification questioning.

If it were another part—I don't like why they don't seem to be paying attention at all. But I understand as it goes on and on. But when you're in a small group death qualification, that's an issue. And when they're not looking at me, I make a mental note of it.

And I remember distinctly that she did not answer immediately upon me asking the question. That cannot be reflected in the record. If there's a pause, the record will not show question, whatever it is, pause, yes. It will just say yes.

I made a note of it. And I've tried over thirty jury trials. I've been involved in four death penalty cases. I know how to analyze a person's demeanor in determining whether or not they're going to be good for me or bad for me. I've had experiences both ways.

And based on her demeanor, and my analysis of her demeanor, and my experience selecting all these jurors in various jury trials over my ten-year career as a lawyer,—and further, I consulted with [another prosecutor], my co-counsel, and he had in his notes the word liar. That she, in fact—he, independently of me, also thought that she was not being truthful with regard to her views on the death penalty. We discussed it together. It was our decision that she is never going to return a verdict of death. I question whether or not she's ever going to return a verdict of guilty no matter what the evidence is.

And it's for all those reasons that I struck her. There's no similarly situated juror. Those are race neutral reasons. It has nothing to do with her race. It has to do with whether a juror, I think, can follow the law or not. I don't think she's going to follow the law. I think no matter what I put on there, there's no way she could return a verdict of death.

That's the way I view it. If other people disagree, fine. But the way I view it, the way [the other prosecutor] viewed it, we saw that we don't think that she's ever going to return a verdict of death. And it's because of her demeanor, her answers, her appearance, and her status of an unlicensed driver.

I don't think that an unlicensed driver is that big of a deal. But you combine all of it, she's obviously sitting—I, in

fact, asked her about her license. I thought, well, maybe if she's got some physical problem, I can't tell by looking at her, that's a reason why you wouldn't have a driver's license in St. Louis. She's not elderly. She probably looks to me like she's in her twenties.

And it seems to me odd that somebody who especially has retail employment at her job as a Foot Locker employee, which would have, I would assume, varying hours, which would make it very difficult to get to work if you don't have a license, an ability to drive a car. That's what we experienced with the juror who didn't show up today, because she said she didn't have a ride, and didn't have a license.

So those are my reasons. They are all race neutral. It has nothing to do with race.

Defense counsel then argued that S.H.'s hairstyle did not set her aside from the community of African–American women, so that the prosecutor's explanation "makes it even actually more of a racial issue." Counsel also disputed the idea that not having a driver's license means you are not invested in the community, and she criticized the prosecutor for not asking S.H. why she did not have a driver's license.

The judge then explained why he was denying the *Batson* challenge:

With regard to Venireperson [S.H.], [the prosecutor] did—I have—the Court has gotten the transcripts of both the death penalty and the general voir dire of [S.H.]. And the Court has read those in detail, and especially the death qualification.

They are just very plain simple yes or no answers. And it's not—it doesn't give—doesn't reflect the pauses.

Do you normally put pauses in there?

COURT REPORTER: No.

THE COURT: So more importantly, with regard to the general voir dire in particular, [the prosecutor] stated going in—the Court is aware that a prosecutor or an attorney can't set somebody up in order to do a *Batson* strike by the type of specific questions to an individual. But when [the prosecutor] started questioning [S.H.] with regard to the driver's license, and started getting into more of the details, my perception of [S.H.] was she was very offended by that. And her—by going into that detail. And I'm not sure if [the prosecutor] had gone any further, she would not have been even more offended.

I don't—I didn't see any offense towards [the prosecutor] or towards the defense in the death penalty voir dire. But in the general voir dire, I did notice that.

With regard to the first point of any other similarly situated jurors, there are no similarly situated Caucasian jurors that were of a similar physical mannerism, except for the individual that had the tattoos on his head, extensive beard, and a shaved head, who was stricken for cause much earlier on.

And there's no other similarly situated individuals that had such a hair style, or hair coloring, or stood out of the normal out of this panel, regardless if they were Caucasian or even African–American people in particular. So there's no other similarly situated individuals that way.

The third factor under that case of *Marlowe* [*State v. Marlowe*, 89 S.W.3d 464 (Mo. banc 2002) ] is the prosecutor's credibility based upon the prosecutor's demeanor and statements during voir dire, and the Court's past experiences with [the prosecutor].

I've tried probably seven to ten cases with [the prosecutor] over a five and a half year period. [The prosecutor], in fact, has avoided on many occasions attempting to even get into a *Batson* type challenge area. He—I find that his voir dire is very straight, to the point. As a trial attorney, I'm not sure I could try the same type of case and get away with it. But he treats everybody the same, and it doesn't matter who they are. He sort of runs, says whatever he says, and goes right through it. And he shows no racial animus. He is—in this case, nor any other cases.

In that case of *Hopkins* [*State v. Hopkins*, 140 S.W.3d 143 (Mo.App. E.D. 2004)] we've been—the Eastern District Court of Appeals came out with an opinion on *Hopkins* in August 24, 2004, written by the Honorable Booker T. Shaw, that went into detail of did the prosecutor ask a number of questions against African–American jurors more, or the number of questions that were asked. And I've tried to keep track of the questioning [the prosecutor] did. And [the prosecutor] didn't specifically go to question African–American jurors.

There were, in my—he did not question the African–American jurors more than the Caucasian jurors. He didn't change his questions from a Caucasian person to an African–American, an African–American to a Caucasian.

So on the basis of the *Hopkins* type analysis of [the prosecutor's] voir dire, and his voir dires in the past, [the prosecutor] has clearly not been violative of any of those type of—in particular, we had one, two, three, four, five, five African–American females, one African–American—let's see. Six African–American females, one African–American male, and one Asian–American who made it to the general voir dire after death qualification. One African–Ameri-

can female struck herself by failing to appear for approximately over two hours for the voir dire. One of the African–American males, in fact, was stricken for cause.

And at this point in time, [the prosecutor] has stricken [venirepersons D.C., L.P., S.H.]. And the Court and even defense counsel have acknowledged that those are race neutral reasons. And clearly the Court will say—there's no ability for the Court to say there's any ability to say, in fact, that there was any racial reason for any of those. Those were strictly for non-racial reasons.

And [the prosecutor's] record prosecuting these cases has been clear, how he's performed with regard to these cases.

We're going to [S.H.]. And the situation is the circuit judge, in fact, actually grew up in the City of St. Louis and actually attended St. Louis City Public Schools when he was young, and is very familiar, and actually worked for the City of St. Louis for a number of years. Worked for the City of St. Louis, worked in the Federal Court down in the City of St. Louis, and only left the City of St. Louis approximately seven or eight years ago from living in the City for thirty-two years.

And I'm out in the courthouse here. And St. Louis County is also a very racially diverse courthouse. And the red hair of [S.H.] is not a hairstyle that is—the Court has seen on a lot of—ever, really, before. And it is a very distinctive red hairstyle that [S.H.] has.

It may not be the same structure as somebody who looks like a skinhead, who left the jury for cause, but at the same time that is—that is a—you know, courts have been clear that the physical features of an individual are a race neu-

tral reason. The United States Supreme Court in [*Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) ], which is affirming of a secondary conviction. This was a prosecutor's proffered explanation for peremptory challenge of a black male: The jury had long unkempt hair, moustache and a beard, was race neutral and satisfied the prosecutor's burden of articulating a not discriminatory reason for the strike.

I think the red hair also, as [the prosecutor] indicates, does distinguish her and makes her separate from the crowd, and very individualistic. And [the prosecutor] from his prosecutorial experience does not necessarily want that on a jury.

And I think that based upon the second reason of the degree of logical relevance between the proffered reason and the case to be tried, there is a case that people that are sort of out there on the fringe, whether by hair, or how they dress, or mannerisms, a prosecutor for a non-racial reason will not want that type of person on this case.

The explanation given for the non—having a non-driver's license, I think in and of itself, is not a very—is not logically relevant between—is not really logically relevant. Although there's no similarly situated Caucasian jurors that are of that mode.

But conceivably if you combine that with the fact that this—well, various different red-colored hair, that that condition in and of itself, I think, just not having a license would be clearly not a good enough rationale for a strike, to strike her. But in combining the others, and the Court's past experience with [the prosecutor], and watching the animosity that the juror had, and the Court's taking notice that a prosecutor can't themselves cause a strike because

of how they question somebody, and I don't believe [the prosecutor]—the way [the prosecutor] asked [S.H.] was.

But [S.H.], I think, was taken aback by the questioning concerning the license. I'm not sure if she was offended. She appeared offended. But I'm not sure if that would play any role.

But the—based on those reasons, I will deny the *Batson* challenge.

Subsequently, when the *Batson* question was raised again at the hearing on the motion for new trial, the judge described S.H.'s hair as "fluorescent" and an assistant prosecutor stated that S.H.'s hair "looked more like Ronald McDonald's red hair. It looked like clown red hair. It tended more towards the orange side."

It is clear from the record that the prosecutor and the judge went to great lengths to follow the letter of the law regarding *Batson* procedures and to assure that the peremptory strike was free of racial bias. The majority's stated concern, however, is that "the State and the trial court presume to identify difference from a limited cultural view," and as claimed by defense counsel during voir dire, that red hair is "quite fashionable in the African–American community." But the record shows not simply that S.H. had red hair, but that her hair was "red—a color of red brighter than the ink that comes out of a red pen or a marker," it was "crazy red hair," "fluorescent," "like Ronald McDonald's red hair," "like clown red hair." Even defense counsel speculated that S.H. may have been wearing a wig. Her hair was distinctive, to say the least, and did indeed "[make] her separate from the crowd, and [appear] very individualistic." This is indeed a race-neutral explanation.

A juror's appearance in *Batson* analysis has invariably been held to be a valid basis for exercising peremptory strikes. For

instance, the trial court properly relied on *Purkett v. Elem,* in which the United States Supreme Court held that "the prosecutor's proffered explanation in this case—that he struck juror number 22 because he had long, unkempt hair, a mustache, and a beard—is race neutral...." 514 U.S. at 769, 115 S.Ct. 1769. Similarly, this Court in *State v. Williams,* 97 S.W.3d 462, 471 (Mo. banc 2003), approved a prosecutor's explanation for a peremptory strike "that the venireperson's earrings and clothing indicated that he was 'trying to be different' and was 'liberal.'" The Court explained that "[s]triking a prospective juror based upon clothing and attire does not reflect an inherent racial bias motivating the strike." *Id.* In my view, there is no logical way to distinguish these cases from the case at hand.

In addition, although S.H.'s appearance was the principal justification for the strike, the trial court expressly acknowledged that S.H. showed hostility toward the prosecutor. He also acknowledged that S.H.'s lack of a driver's license, though perhaps not enough in and of itself to justify the strike, was still a factor to be considered. Unfortunately, the majority dismisses these additional explanations without analysis except to say that S.H.'s hostile reaction was a "misperception."

Ultimately, the majority gives nothing but lip service to the fundamental tenets of *Batson* jurisprudence "that peremptory strikes are subjective, and great reliance is placed on the trial court's assessment of the legitimacy of the State's explanation." Under the totality of the circumstances, I am quite unwilling to convict the prosecutor and the judge of racial prejudice, and I would hold that the trial court's denial of the *Batson* challenge was not clearly erroneous.

I concur in the majority opinion to the extent that defendant is entitled to a new penalty phase trial because of the admission of evidence that defendant had been convicted of an earlier murder. The fact that the conviction was reversed on appeal after trial in this case mandates reversal here, too.