

**NUMBERS 13-13-00437-CV**
**13-13-00438-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

### IN THE INTEREST OF L.C., M.C., J.E.S. AND D.M., CHILDREN

---

**On appeal from the 343rd District Court
of Live Oak County, Texas.**

---

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Benavides and Longoria
Memorandum Opinion by Justice Longoria**

This is a termination of parental rights case involving one parent and four children. By two issues, appellant Y.G. challenges the legal and factual sufficiency of the evidence supporting the judgments terminating her parental rights over her minor children, L.C., M.C., J.E.S., and D.M.[1] *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (O), (P), § 161.001(2) (West 2008). We affirm.

---

[1] We refer to appellant, the children, and their family members by their initials in order to protect the privacy of appellant and the children. *See* TEX. R. APP. P. 9.8(b).

## I. BACKGROUND

On July 28, 2011, the Department received a referral alleging neglectful supervision of L.C., M.C., and J.E.S. by appellant.[2] The report alleged that appellant was leaving the children in the care of her boyfriend M.M., a drug dealer; appellant was using drugs herself; someone in the house was supplying marijuana to C.G., appellant's oldest child; and M.M. was having sexual contact with C.G.

The Department opened an investigation and ruled out all of the allegations involving C.G. The Department also found that appellant had "acted appropriately" in taking C.G. to medical appointments and enrolling her in counseling. Appellant later sent C.G. to live with relatives in California, and C.G. is not a party to the case. The Department remained involved with appellant because a drug test that appellant submitted to during the initial contact tested positive for amphetamines and methamphetamines. Appellant had previously admitted to taking Ritalin that had not been prescribed for her. The Department was also concerned that appellant had been diagnosed with post-traumatic stress disorder, bipolar disorder, and attention deficit disorder and had not been treated or taken any prescribed medication for four years. Appellant signed a safety plan that included having a relative move into her house to monitor contact between appellant and her children. As part of the plan, appellant agreed to complete a substance abuse assessment, a mental health screening, attend and complete counseling, and avoid consuming illegal drugs.

---

[2] At this time, D.M. had not yet been born. The Department later received a separate referral regarding D.M. because appellant tested positive for amphetamines at the time of his birth. The Department started a separate case involving only D.M. The trial court heard and decided both cases simultaneously but rendered separate judgments. Appellant appealed the judgment terminating her rights over D.M. separately to this Court under cause No. 13-13-00438-CV. We dispose of both appeals in one opinion because the legal issues are the same. *See* TEX. R. APP. P. 47.1.

The case was transferred to the Department's Family Based Services, and Yolanda Gonzalez was assigned as the caseworker.[3] Gonzalez first made contact with appellant in November of 2011 and discovered that the relative who agreed to monitor contact between appellant and her children had moved out. Appellant signed a second safety plan where she agreed that her neighbor would monitor appellant's contact with her children. During the home visit, Gonzalez also observed that appellant's face appeared bruised; appellant explained that she had been assaulted by six teenagers who tried to rob her. The next day, Gonzalez transported appellant and her children to a doctor's appointment; appellant admitted to her that she had actually been assaulted by her ex-boyfriend, J.S, who is the father of J.E.S. Appellant explained that she did not call the police because her current boyfriend M.M. was also involved in the fight and "they did not want any trouble."

During a home visit on December 21, 2011, Gonzalez observed that appellant's face again appeared bruised. Appellant told Gonzalez that J.S. appeared at her house and assaulted her again, but that the children were at a neighbor's house at the time. Appellant also told Gonzalez that M.C. broke her arm in the shower a few days before. The caseworker spoke with M.C., but she "could not determine if this happened while she was alone in the shower or not."

Gonzalez received appellant's initial substance abuse assessment on the same day. The therapist wrote that appellant was "unkempt, loud, defensive, evasive, and resistant." The therapist also noted that appellant "seemed unstable" because appellant reassured her son that she was not mad at the therapist and was not going to harm the

---

[3] We take this description of the events leading up to the time that the trial court granted the Department's petition for temporary conservatorship from Gonzalez's First Amended Affidavit in Support of Removal. The affidavit was part of the record before the trial court.

3

therapist even though appellant's son had not spoken during the assessment.

On December 27, 2011, an assistant caseworker transported appellant to a follow-up mental health assessment during which appellant stated that she no longer wished to move to avoid J.S. Gonzalez called appellant and they agreed to meet to discuss a safety plan. The next day, Gonzalez went to appellant's residence to discuss the safety plan but discovered that appellant had left her children in the care of her neighbor and left town for a day.

Gonzalez returned to appellant's residence on December 29. Appellant signed a new safety plan where she agreed to not let J.S. into the house and to call the police if he tried to confront her. Appellant again submitted to a drug screening, and admitted that she consumed methamphetamines when she had been out of town. Appellant explained that she had been drinking alcohol with friends the day before and "started freakin' out and [. . .] needed to calm down" because she wanted to cut herself. Appellant stated that this was the first time in five years that she had felt a desire to harm herself. Appellant also stated that she consumed methamphetamines to avoid sleeping because of nightmares. Appellant denied ever using drugs while taking care of her children; appellant's neighbor confirmed that she takes care of the children "every time [appellant] goes out," including on the day when appellant said that she had most recently used methamphetamines. Appellant signed an updated safety plan where she agreed that she would not use drugs and that her neighbor would continue to monitor appellant's interaction with her children. Appellant's drug screening returned positive for methamphetamines.

On January 3, 2012, appellant contacted Gonzalez with a placement option for

the children. The Department agreed to the placement and the children were placed.[4] On February 3, 2012, appellant and M.M. picked up the children from the placement residence "unexpectedly" and "without any clothing or supplies." The Department was unable to locate the children and petitioned the court for temporary managing conservatorship. The Department cited appellant's "ongoing methamphetamine use and untreated mental illness with vulnerable children in her care" as grounds for removal. The trial court granted the Department's petition.

The trial court held an adversary hearing on February 15, 2012. J.S., the father of J.E.S., was contacted by phone to inform him of the adversary hearing, but he did not appear. The trial court issued a temporary order confirming the Department's conservatorship. The temporary order required appellant to comply with "each requirement of the Department's original, or any amended, service plan." Appellant signed the service plans promising to refrain from using illegal drugs and acknowledging that if she failed to comply with the plans' requirements, she would not regain custody of her children, and could permanently lose custody.

Following a status hearing held on March 28, 2012, the Department could not contact appellant for a period of approximately three months despite multiple attempts. Once the Department resumed contact with appellant, they learned that she had moved from Three Rivers, Texas to Beeville, Texas without notifying the Department in order to "start a new lifestyle." The Department later learned that for part of that time appellant had checked herself into the Rainbow House in Corpus Christi and later moved to the Women's Shelter, stating that she did not want to return to her house because of the

---

[4] There is no information in the record about the persons who agreed to care for the children or whether the placement family was composed of relatives.

5

risk of assault from J.S.

Sandra Alvarez, another Department caseworker, testified at the termination hearing that appellant later successfully completed parenting, anger management, and substance-abuse classes, but the Department remained concerned because appellant was unable to secure adequate housing. Appellant later obtained work as a gate guard, but she had stopped attending counseling because of the amount of hours that she worked each day. Appellant was still unable to find housing that was big enough for all of the children and could not explain how she would be able to take care of her children if she regained custody due to the length of her working day.

On November 19, 2012, the Department received another referral regarding appellant because she tested positive for amphetamines when she gave birth to D.M.[5] Appellant admitted to Alvarez that she consumed Ritalin that had not been prescribed to her for two months prior to the birth. Alvarez also testified that appellant was no longer on the medications prescribed to her by MHMR to treat her mental illnesses.[6] The trial court granted the Department temporary managing conservatorship over D.M. The trial court also recommended that appellant and M.M., D.M.'s father, find a placement for the child.

On December 3, 2012, appellant checked herself into a psychiatric hospital after attempting suicide by slitting her throat and wrists. The Department created a family service plan for appellant and M.M. to resume custody of D.M. Appellant signed the plan, but M.M. did not. The plan also included a provision prohibiting appellant from

---

[5] We will refer to L.C., M.C., and J.E.S. as "the three older children" where necessary to differentiate them from D.M.

[6] It is not clear from the record if appellant stopped taking the medications or if she exhausted the supply she received from the MHRM program.

6

using illegal drugs.

Alvarez testified that after leaving the hospital appellant began "doing what she needed to do." Appellant obtained housing and employment (this time as a bookkeeper for a furniture business and as a clerk at a convenience store), resumed attending counseling sessions, submitted to random drug testing, and complied with the MHMR program. However, appellant still did not complete the "substance abuse after care program."

Michelle Mendoza, the final Department caseworker, also testified at the termination hearing. On April 26, 2013, appellant submitted to another drug test and had a weekend visit with the three older children. Mendoza transported the children to appellant's residence and stayed for over an hour. Mendoza testified that during the time that she was present, appellant acted very erratically: "she would be calm one minute and then she would get very angry." Mendoza testified that at one point appellant told her friend Tonya, who had been trying to calm appellant down, that she and Tonya needed to stop talking or else Mendoza "would think they were tweaking." Mendoza testified that she did not understand the reference at the time but that she later learned that the phrase "has to do with someone's behavior when they're on drugs."

Mendoza further testified that when she picked up the children after the home visit, they told her that appellant took them to visit M.M. in the Live Oak County Jail where he was incarcerated. This was a violation of the agreement that appellant and Mendoza had signed about the visit which stipulated, among other things, that appellant was not going to leave the residence with the children without first contacting Mendoza.

7

Appellant also gave Mendoza the medication that had been prescribed to the children. Mendoza testified that appellant "handed the medication back to me and said that although she knew she was supposed to give it to them, she didn't believe in giving the medication and was not going to give it to them."

Several days later, Mendoza received the results of the drug test appellant took on the day of the visit with the children. Mendoza testified that the drug test tested "high positive" for methamphetamines. Mendoza testified that this test result meant that appellant had consumed those substances "very recently," before the test, but she could not testify that it definitely meant that appellant was under the influence during the visit with her children.

Mendoza testified that the three older children are in a stable foster family in the Houston area. All three of the children passed to the next grade level in school, and she described them as generally doing well. Mendoza also testified that D.M. has been placed with a caregiver in a different city and described him as "thriving." Mendoza also testified that at the time of trial, appellant was incarcerated in jail on a charge of credit card abuse and was unable to make a $5,000 bond.

Appellant appeared at the termination hearing and was represented by counsel, but the alleged fathers of the children, J.S., I.C., and M.M., did not appear.[7] Appellant testified at the end of the termination hearing, but her testimony did not add any additional information. Appellant's counsel passed the witness after the judge

---

[7] M.M., the father of D.M., was served and executed an affidavit relinquishing his parental rights. The Department was never able to find any contact information for I.C., who is not an American citizen, and eventually sent a notification letter to his country's consulate. The Department was unable to contact J.S. again after the phone conversation notifying him of the adversary hearing that was scheduled after the Department was granted temporary managing conservatorship of the three older children. After the Department moved to terminate appellant's parental rights, the Department sent letters to two addresses for J.S., but both were returned marked "return to sender."

admonished appellant for "telling stories" instead of using a question-and-answer format. The cross-examination of appellant also did not elicit any new information except that appellant no longer possessed the van she had purchased to transport the children.

Following the hearing, the trial court rendered judgments finding that the Department had shown by clear and convincing evidence that appellant had committed four statutory grounds for termination, and that termination was in the best interests of the children. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (O), (P), § 161.001(2). The court also terminated the parental rights of I.C. and M.M. Appellant timely perfected this appeal, but none of the fathers appealed the termination order.

## II. STANDARD OF REVIEW

"The natural right which exists between parents and their children is one of constitutional dimensions." *In re J.W.T.*, 872 S.W.2d 189, 194–95 (Tex. 1994) (citing *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). Accordingly, we must strictly scrutinize termination proceedings in favor of the parent. *In re A.C.*, 394 S.W.3d 633, 639 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

A court may order the parent-child relationship terminated upon a finding that the parent engaged in certain conduct specified in section 161.001(1) of the family code, and that termination is in the best interests of the child. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002); *see* TEX. FAM. CODE ANN. § 161.001(1)–(2). The State must establish both elements; termination may not be based solely on the trier of fact's determination of the best interests of the child. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The State's burden of proof is by clear and convincing evidence, a

9

standard the family code defines as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008). This is an intermediate standard that "falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings." *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi 2010, no pet.)

The Texas Supreme Court has explained the unique procedure for reviewing the legal sufficiency of the evidence in a parental termination case as follows:

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.
>
> If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. Rendition of judgment in favor of the parent would generally be required if there is legally insufficient evidence.

*In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) (citations omitted).

"The difference between legal and factual sufficiency when the burden of proof is clear and convincing evidence may be a fine one in some cases, but there is a distinction in how the evidence is reviewed." *Id.* In a factual sufficiency review, we ask:

10

whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*Id.* (citing *In re C.H.*, 96 S.W.3d at 25). However, our review "must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d at 26.

### III. STATUTORY GROUNDS

### A. Applicable Law

Section 161.001(1)(O) of the Texas Family Code provides that a court may terminate the parent-child relationship if the parent:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child

TEX. FAM. CODE ANN. § 161.001(1)(O).

"The Family Code does not provide for substantial compliance with a family services plan." *In re M.C.G.*, 329 S.W.3d 674, 676 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (supp. op.). Section 161.001(1)(O) "does not encompass an evaluation of a parent's partial achievement of plan requirements to determine whether or not the parent failed to comply with the plan." *In re J.S.*, 291 S.W.3d 60, 67 (Tex. App.—Eastland 2009, no pet.); *In re T.N.F.*, 205 S.W.3d 625, 631 (Tex. App.—Waco 2006, pet. denied) (observing that "the statute itself does not make a provision for excuses"), *overruled in part on other grounds, In re A.M.*, 385 S.W.3d 74, 78 (Tex.

11

App.—Waco 2012, pet. denied). We consider any excuses for failing to comply with a provision of a family service plan under the best interests analysis. *In re M.C.G.*, 329 S.W.3d at 675; *see In re T.N.F.*, 205 S.W.3d at 631.

### B. Analysis

There is no dispute that the children had been in the temporary managing conservatorship of the Department for more than nine months following their removal on the basis of chapter 262 of the family code. *See* TEX. FAM. CODE ANN. § 161.001(1)(O). There is similarly no dispute that the trial court signed an order on February 15, 2012 (for the three older children) and December 12, 2012 (for D.M.) in which it ordered appellant to comply with the Family Service Plans drawn up by the Department as a condition for the return of the children. The plan required appellant to, among other things: (1) attend and complete individual counseling; (2) maintain safe and proper housing for herself and her children; (3) complete a psychosocial evaluation; (4) participate in a mental health screening offered by MHMR; (5) not abuse drugs or alcohol; and (6) attend and complete parenting classes.[8]

Appellant argues that she has more than "substantially complied" with the service plan, but she also admits in her brief that she tested positive for methamphetamines four times after L.C., M.C., and J.E.S. were removed from her care. She further admits that she took Ritalin without a prescription for two months during her pregnancy with D.M. and tested positive for methamphetamines three times after his birth. Appellant did not argue or produce any evidence that any of these drugs had been prescribed for her by a physician. Because appellant's argument does not raise a fact issue regarding

---

[8] The family service plan that the Department drew up for D.M. was substantively identical to the plan for the three older children.

12

whether she complied with the provision of the family service plans requiring her to refrain from using drugs, we conclude that the evidence is legally and factually sufficient to support a reasonable trier of fact's firm belief that appellant failed to comply with her court-ordered service plans. *See In re M.C.G.*, 329 S.W.3d at 676; *In re J.S.*, 291 S.W.3d at 67; *In re T.N.F.*, 205 S.W.3d at 631; *see also In re J.J.D.*, No. 13-11-00388-CV, 2012 WL 2361796, at *3 (Tex. App.—Corpus Christi June 21, 2012, no pet.) (mem. op.) (upholding order terminating parental rights of a mother for failing to comply with a service plan by exhibiting a similar pattern of cocaine use).

We overrule appellant's first issue. Because the State need only prove one of the statutory grounds for termination, we will not address the other grounds alleged in the trial court. *See In re C.H.*, 89 S.W.3d at 23; *see also* TEX. R. APP. P. 47.1.

## IV. BEST INTERESTS

### A. Applicable Law

In addition to a statutory act or omission, the State must also prove that terminating appellant's parental rights is in the best interests of the children. TEX. FAM. CODE ANN. § 161.001(2). We indulge "a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). It is the Department's burden to rebut that presumption by clear and convincing evidence. *In re C.M.C.*, 273 S.W.3d 862, 876 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (op. on reh'g).

The Texas Supreme Court has announced a list of factors to guide courts in conducting a best interests determination:

> (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and

13

physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions.

*See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).  This list is not exhaustive, and evidence for all of these considerations is not necessary to form sufficient evidence to support a best interests findings.  *See In re C.H.*, 89 S.W.3d at 27.  "Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child."  *M.C. v. Tex. Dep't of Family and Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied).  Although proof of a statutory violation under section 161.001(1) "does not relieve the petitioner from proving the best interests of the child, the same evidence may be probative of both issues."  *In re C.H.*, 89 S.W.3d at 28.

### B.  Analysis

There are a number of considerations that, when taken together, support the trial court's firm belief or conviction that termination is in the best interests of all four children.

During the pendency of this case appellant was frequently unable to maintain a stable residence.  *See In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied) ("The goal of establishing a stable permanent home for a child is a compelling state interest.").  Several of those moves were either to avoid J.S. or into the hospital for treatment after her suicide attempt, which we do not fault her for.  However, appellant also made it difficult for the Department to locate her and, on one occasion, to

14

locate the children. In February of 2012, less than a month after the children were placed in a home with appellant's approval, M.M. and appellant abruptly appeared at the placement residence and picked up the children from the residence "without any clothing or supplies" and according to people nearby, appellant "stated they [were] leaving and not returning home." In March of the same year, appellant abruptly moved from one town to another and did not inform the Department for at least ninety days, even though she was aware that her rights over her children were in danger of being permanently terminated. *See In re A.C.*, 394 S.W.3d at 643 (holding that the fact that the mother took a child out of state immediately after birth making it "difficult for the Department to locate her and provide services" weighed against the mother in the best interests analysis).

In spite of her frequent residence changes, appellant did manage to maintain a stable residence for several months in the period leading up to the termination hearing. However, by the time of the termination hearing, appellant had been incarcerated for a little over a month. Appellant stated that she thought she would be released the week after the hearing, but the record is unclear as to whether she was actually released or if the charges are still pending. While we do not know the result of appellant's case, incarceration at the time of trial is relevant in determining whether a parent is capable of meeting the present and future needs of the child and capable of providing a stable home. *See Latham v. Tex. Dep't of Family and Protective Servs.*, 177 S.W.3d 341, 349–50 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *In re M.D.S.*, 1 S.W.3d 190, 200 (Tex. App.—Amarillo 1999, no pet.).

Furthermore, appellant's admitted use of methamphetamines and amphetamines that had not been prescribed to her in violation of her family service plans are probative of the best interest analysis. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support finding that termination is in the best interest of the child."). Parental drug use during pregnancy and after the removal of the children weighs against the parent in the best interests analysis. *Robinson v. Tex. Dep't of Protective and Reg. Servs.*, 89 S.W.3d 679, 688 (Tex. App.—Houston [1st Dist.] 2002, no pet.). This is especially true if a parent continues to use drugs after completing a substance abuse treatment program. *See id.* ("Here, appellant's [substance abuse] counseling has not altered her behavior. Appellant admitted to illegal drug activity as recently as four months before trial, in violation of her community supervision and the Plan."); *see also In re B.S.G.*, No. 04-09-00231-CV, 2009 WL 2413700, at *2 (Tex. App.—San Antonio Aug. 5, 2009, no pet.) (mem. op.) (holding that the fact that appellant tested positive for drugs five times during the pendency of the case even after entering a substance abuse program weighed against the appellant in the best interests analysis).

Appellant responds by arguing that terminating her rights would not be in the best interests of the children because she has successfully turned her life around and we are to presume that it is in the best interests of the children to remain with their natural parents.[9] *See In re R.R.*, 209 S.W.3d at 116. She asserts that she "proved that she could provide income to provide for her children's needs by her employment with the

---

[9] There was no evidence in the record of the childrens' desires except for testimony that they were happy to see their mother during visits and were sad when she left.

16

furniture re-sale business, and by securing a suitable home for them." We agree that appellant made strides after she left the hospital by securing employment and maintaining a residence in one location for a period of several months, but she also continued to test positive for drugs even during this time. Appellant was incarcerated at the time of the trial, which makes uncertain her future ability to care for the children. Even if we were to assume that appellant's turnaround is permanent, "evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past." *Smith v. Tex. Dep't of Protective and Reg. Servs.*, 216 S.W.3d 673, 682 (Tex. App.—Austin 2005, no pet.). Appellant has a long history of drug use, mental illness, and abusive relationships, and the trial judge, acting as the factfinder, could fairly conclude that this past history overrode the gains appellant recently made. *See In re M.G.D.*, 108 S.W.3d 508, 514–15 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (concluding that the evidence was sufficient to support a finding that termination was in the best interests of the child in light of the mother's long history of drug addiction and abusive relationships, even though the mother had recently obtained a "good job" and broken away from an abusive boyfriend).

The theme underlying appellant's argument to this Court is that "[g]iven her mental disabilities . . . she did the best she could with what she had." In her life up until this point, appellant has contended with a combination of mental illness, drug addiction, domestic violence, and reduced financial circumstances that would more than tax the capabilities of most people. We acknowledge her struggles and the successes that she has enjoyed, but we cannot ignore her past history. In sum, after a thorough review of the record, we conclude that there is evidence that the present and future needs of the

17

children, the programs available to assist the parent, the stability of appellant's home, and the acts or omissions that indicate the parental relationship is improper, all weigh in favor of termination. We conclude that the evidence is both legally and factually sufficient to support a reasonable factfinder's firm belief or conviction that terminating appellant's parental rights is in the best interests of the four children. We overrule appellant's second issue.

## V. CONCLUSION

We affirm the judgments of the trial court.

_____
NORA L. LONGORIA
Justice

Delivered and filed the
19th day of December, 2013.