**STATE of Missouri, Respondent,**

v.

**Gregory BOWMAN, Appellant.**

**No. SC 90618.**

Supreme Court of Missouri,
En Banc.

April 12, 2011.

Rehearing Denied May 31, 2011.

682

Stephen B. Evans, Katherine E. Hummel and Katherine Schierholz, Evans Partnership, St. Louis, for Bowman.

Terrence M. Messonnier, Attorney General's Office, Jefferson City, for State of Missouri.

RICHARD B. TEITELMAN, Judge.

Gregory Bowman was found guilty of one count of first-degree murder, section 565.020, RSMo 2000, for killing Velda Rumfelt. Bowman was sentenced to death consistent with the jury's recommendation. This Court has exclusive jurisdiction. Mo. Const. art. V, sec. 3. The judgment of conviction is affirmed. The death sentence is reversed because two of the aggravating circumstances found by the jury consisted of murder convictions that were reversed and vacated on appeal. The case is remanded.

## FACTS

Velda Rumfelt was murdered in 1977. There were ligature marks and a laceration around her throat. Her bra was stuffed in her mouth. A large amount of sperm was found in her vagina, which was consistent with recent sexual intercourse. The medical examiner concluded that strangulation was the cause of death. Rumfelt's clothing was removed and kept as evidence. No one was charged with Rumfelt's murder.

In 1979, Bowman was convicted in Illinois of killing Ruth Ann Jany and Elizabeth West and was sentenced to two concurrent terms of life imprisonment. In 2001, the convictions were vacated and new trials were ordered on grounds that Bowman's confessions were coerced. Bowman remained in jail in Illinois until he posted bail in 2007.

Shortly after Bowman's release from jail, James Rokita, an investigator with the Belleville, Illinois, police department, forwarded Bowman's DNA profile to the St. Louis County police department. St. Louis County investigators compared Bowman's DNA profile to the DNA profile extracted from sperm recovered from Rumfelt's underwear. Bowman's DNA profile matched the DNA profile of the sperm recovered from Rumfelt's underwear. The estimated frequency of the DNA profile derived from the sperm was 1 in 460,000,000,000,000. Additional testing determined that Bowman's DNA could not be excluded as the contributor of non-sperm DNA recovered from Rumfelt's clothing.

Bowman was charged with Rumfelt's murder. The State presented evidence that Bowman's DNA was found in Rumfelt's underwear. Dr. Mary Case, the St. Louis County medical examiner, testified that the cause of death was strangulation and that Rumfelt was the victim of a probable sexual assault. One of Rumfelt's friends testified that she saw Rumfelt walking with an unidentified young man on the evening of June 5, 1977. Another friend testified that she saw Rumfelt on the morning of June 6, 1977. Rumfelt's body was discovered on June 7, 1977. The jury convicted Bowman of first-degree murder.

During the penalty phase, the State presented testimony from seven witnesses. Two witnesses were victims of crimes committed by Bowman. Bowman filed a motion in limine to limit victim impact evidence. The motion was overruled, and Bowman's objection was deemed to be continuing.

The State's first witness testified that in 1972, Bowman held a knife to her throat, made her undress and then robbed her. In that case, Bowman was convicted of armed robbery, aggravated battery and unlawful restraint.

The second witness testified that in 1978, Bowman held a knife to her throat, forced her into a car, drove off and threatened to kill her. In that case, Bowman was convicted of kidnapping and unlawful restraint.

A third witness testified that in 1972, Bowman held a knife to her throat, took her to an isolated area and tried to sexually assault her. Bowman let her go but threatened to kill her if she told anyone. No charges were filed.

Two police officers testified regarding their investigation of the Elizabeth West and Ruth Ann Jany murder cases in Illinois. One of the officers testified regarding his involvement in the investigation of the West and Jany cases. The other officer testified that Bowman admitted to killing both victims. Bowman eventually recanted both admissions. The jury heard that Bowman was convicted of both murders.

The sixth penalty phase witness was Elizabeth West's mother. She testified regarding the impact that Elizabeth's murder had on the family.

Finally, Rumfelt's brother testified about the impact of her murder. He testified that Rumfelt was a talented young woman, that he and his sister had a close relationship, and that for nearly 30 years, the family did not know what had happened to her.

The jury found six aggravating circumstances: (1) Bowman had a history of serious assaultive convictions due to his convictions for armed robbery, aggravated battery and unlawful restraint; (2) Rumfelt's murder involved depravity of mind and was outrageously wanton and vile because the killing was random and, therefore, exhibited a disregard for human life; (3) Bowman had been convicted of kidnapping and unlawful restraint; (4) Bowman threatened a teenage girl with a knife; (5) Bowman abducted and murdered Elizabeth West; and (6) Bowman abducted and murdered Ruth Ann Jany.

The trial court sentenced Bowman to death in accordance with the jury's findings. Bowman appeals.

## ANALYSIS

Bowman raises six points on appeal alleging errors in the guilt phase of his trial. None of these points warrant reversal.

### I. Guilt Phase

1. *Release of DNA profile*

Bowman first asserts that the trial court erred in denying his motion to suppress the admission of his DNA profile. The argument is two-pronged. First, Bowman argues that the release of his DNA profile by the Illinois state police violated his Fourth Amendment right to be free from unreasonable search and seizure because he originally consented to submit a DNA sample only to assist in the West and Jany murder investigations. Second, Bowman argues that the release of his DNA profile violated the Illinois genetic privacy act (IGPA) and that the IGPA extends the protections afforded by the Fourth and Fourteenth amendments.

■ The trial court's decision to overrule a motion to suppress evidence will be reversed only if it is clearly erroneous. *State v. Granado,* 148 S.W.3d 309, 311 (Mo. banc 2004). Whether the conduct at issue violates the Fourth Amendment is an issue of law that an appellate court reviews de novo. *State v. Sund,* 215 S.W.3d 719, 723 (Mo. banc 2007). The United States Constitution and the Missouri Constitution afford individuals the same level of protection from unreasonable searches and seizures; therefore, the analysis is the same. *State v. Woods,* 284 S.W.3d 630, 634 (Mo. App.2009).

*Fourth Amendment*

█ In July 2001, an Illinois circuit court entered an order permitting authorities to take a blood sample from Bowman as part of the investigation into the West and Jany murders. Bowman consented to the procedure. In 2007, James Rokita, an investigator with the Belleville, Illinois, police department, forwarded Bowman's DNA profile to the St. Louis County police department. Bowman asserts that the transfer of his DNA profile from Illinois to Missouri for purposes of investigating Rumfelt's murder constitutes an unreasonable search and seizure because he only consented to a blood sample for purposes of assisting the West and Jany investigations.

There is no dispute that taking a blood sample DNA sample implicates the Fourth Amendment. However, the Fourth Amendment analysis focuses on the intrusiveness of the initial search, not on the subsequent use of information obtained from that search. Bowman consented to the blood sample. The Fourth Amendment was not violated when Bowman gave the blood sample yielding the DNA sample. Likewise, the subsequent use of the DNA sample obtained from the valid search and seizure does not constitute a Fourth Amendment violation. The use of Bowman's DNA profile after it legally was acquired is neither a search nor a seizure.

Bowman argues that although the initial search and seizure was valid, the subsequent use of his DNA profile in the Rumfelt case exceeded the scope of his consent and, therefore, constitutes a Fourth Amendment violation. There is nothing in the record showing the terms of any agreement between Bowman and Illinois authorities that would limit the use of Bowman's DNA profile. The court order authorizing the sample did not limit the subsequent use of his DNA profile. Moreover, Bowman cites no case standing for the proposition that the Fourth Amendment bars law enforcement from using lawfully obtained personal information in an unrelated criminal investigation. If that were the case, the commonplace practice of identifying a suspect based on fingerprints lawfully obtained during a previous criminal investigation would constitute a Fourth Amendment violation. The rule is no different rule because the identifying feature is DNA obtained pursuant to a court ordered blood sample.[1]

*Illinois Genetic Privacy Act .*

█ Bowman argues that the IGPA, 410 ILCS 513, restricts law enforcement from using information generated in a criminal investigation to investigate a separate crime. Bowman concludes that the IGPA extends the right of privacy and protections afforded by the Fourth and Fourteenth amendments by further restricting when genetic information can be released.

Bowman's argument fails because state law privacy protections do not extend the protections afforded by the Fourth Amendment as applied to the states via the Fourteenth Amendment. For instance, in *Virginia v. Moore*, 553 U.S. 164, 171–174, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008), the Court held that violation of a Virginia state law pertaining to the legality of an arrest did not impact the constitu-

1. For instance, in *Pharr v. Commonwealth,* the Virginia Court of Appeals held that even though the defendant's consent was based on his belief that the DNA would be used only in the case presently under investigation, there was no Fourth Amendment violation resulting from the comparison of his DNA profile to evidence in other cases. 50 Va.App. 89, 646 S.E.2d 453, 456–458 (2007); *see also Commonwealth v. Gaynor,* 443 Mass. 245, 820 N.E.2d 233, 242–244 (2005); *State v. Notti,* 316 Mont. 345, 71 P.3d 1233 (2003); *Herman v. State,* 122 Nev. 199, 128 P.3d 469, 472 (2006).

tional analysis of the reasonableness of the search incident to the arrest. Likewise, even if the IGPA barred the sharing of genetic information in unrelated criminal cases, a violation of those provisions would not support a finding that a defendant's Fourth Amendment rights were violated.[2]

### 2. *Alternative perpetrator*

■ Bowman argues that the trial court erred in excluding evidence that Kevin Kiger murdered Rumfelt. Bowman's offer of proof included evidence that, in addition to being a suspect in Rumfelt's murder, Kiger was also a suspect in the deaths of E.A. and M.L. E.A. and M.L. were, like Rumfelt, young St. Louis-area women who were killed in 1977. Bowman also asserted that Kiger was familiar with the area where Rumfelt's body was discovered. Bowman asserts that the similarities between the three murders establishes Kiger's "modus operandi" and is sufficient to support the introduction of evidence showing that Kiger was the real perpetrator.

■ The trial court is vested with broad discretion to exclude or admit evidence. *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009). Reversal is warranted only if the error was so prejudicial that it deprived the defendant of a fair trial. *Id., citing State v. Morrow*, 968 S.W.2d 100, 106 (Mo. banc 1998).

■■ "Generally, a defendant may introduce evidence tending to show that another person committed the offense, if a proper foundation is laid, unless the probative value of the evidence is substantially

outweighed by its costs (such as undue delay, prejudice or confusion)." *State v. Barriner*, 111 S.W.3d 396, 400 (Mo. banc 2003) (citing 22A C.J.S. Criminal Law sec. 729 (2002)). When the evidence is merely that another person had opportunity or motive to commit the offense, or the evidence is otherwise disconnected or remote and there is no evidence that the other person committed an act directly connected to the offense, the minimal probative value of the evidence is outweighed by its tendency to confuse or misdirect the jury. *Id.*

■ Bowman argues that the evidence connecting Kiger to the deaths of E.A. and M.L. was relevant and admissible because it shared a modus operandi with Rumfelt's murder. The modus operandi cases generally involve instances in which a defendant is challenging the admissibility of similar uncharged conduct used to prove the defendant's identity as the perpetrator of the charged crime. For prior conduct to be admissible to prove identity, there must be more than mere similarity between the crime charged and the uncharged crime. *State v. Bernard*, 849 S.W.2d 10, 17 (Mo. banc 1993). The charged and uncharged crimes must be nearly "identical" and the methodology "so unusual and distinctive" that the crimes resemble a "signature" of the defendant's involvement in both crimes. *Id.*

The bar for establishing a modus operandi is high. For instance, in *State v. Davis*, 211 S.W.3d 86, 87 (Mo. banc 2006), the defendant was charged with robbing a

---

**2.** Although the IGPA does not expand the protections offered by the Fourth amendment, it should be noted Bowman's argument also fails because the IGPA does not bar the disclosure that occurred in this case. Section 15(b) of the IGPA authorizes the disclosure of a legally obtained genetic sample to appropriate law enforcement authorities for purposes of identifying the perpetrator of other crimes. That is what happened in this case. Bowman voluntarily submitted a genetic sample to Illinois authorities. Illinois authorities then disclosed that sample to Missouri authorities for purposes of identifying the person who murdered Rumfelt.

grocery store. The trial court allowed the State to introduce evidence identifying the defendant as one of the perpetrators of another robbery at a bar in order to prove that he also robbed the grocery store. *Id.* The State asserted that the two robberies were sufficiently similar to establish the defendant's modus operandi. In both robberies, two stocky white men carried similar guns and wore dark ski masks and gloves. One man was taller than the other. One man called the other "Ed." The two robberies occurred within 5 miles and within 4 days of each other. In both cases, the robbers took cash and rolled coins. *Id.* at 89. However, there were some differences. In the grocery store robbery, the shorter man called the other man "Paul" and then "Ed." At the bar, the taller robber called the shorter one "Ed." In the grocery store robbery, the perpetrators told the victims that no one would get hurt. In the bar robbery, a customer was threatened with a gun. Finally, the court noted that in the grocery store robbery, both robbers collected money, while during the bar robbery, one robber took the money while the other watched the door. *Id.* Despite the substantial similarities between the two robberies, the Court concluded that the two crimes did not establish a signature of the defendant's involvement to justify admitting evidence of the bar robbery as evidence that the defendant also robbed the grocery store. *Id.*

The similarities between the deaths of E.A., M.L. and Rumfelt are substantially fewer than the similarities between the two robberies at issue in *Davis*. M.L.'s body was found in a city park in Webster Groves, an inner ring suburb in central St. Louis County. M.L. had been strangled with a Venetian blind cord. There is no evidence that M.L. was acquainted with Kiger.

E.A. was found dead in her bathtub. Unlike M.L., E.A. had not been strangled or cut. Unlike M.L., E.A. was acquainted with Kiger.

Rumfelt was strangled, cut with a knife, sexually assaulted and left in an isolated area of southwest St. Louis County.

The three murders are not nearly "identical" and the methodology is not so "unusual and distinctive" as to establish the signature of a particular individual. The only common facts are that all three victims were young women in the St. Louis area and that, at one point, Kiger was investigated as a suspect in all three. Bowman's argument that Kiger's potential involvement in the deaths of E.A. and M.L. establishes Kiger's distinct modus operandi is without merit.

Bowman also argues that his offer of proof was sufficient because it showed that Kiger was acquainted with Rumfelt, was a suspect in the case and was familiar with the area where Rumfelt's body was discovered. The *Barriner* case illustrates the evidence required to demonstrate a direct connection between an alternate perpetrator and the crime charged. In *Barriner*, the trial court excluded evidence that hair not belonging to the victims or the defendant was found on victim's body and on the rope that bound the other victim. The hair evidence was not evidence of motive or opportunity, and it was not disconnected or remote. Instead, the hair evidence was physical evidence that could indicate another person's interaction with the victims at the crime scene. *Id.* at 400. Thus, the trial court erred in excluding Barriner's evidence showing a possible alternative perpetrator's connection to the murders.

In contrast to the direct connection present in *Barriner*, Bowman relies solely on Kiger's alleged opportunity to commit the murder and speculative connections to link Kiger with Rumfelt's murder. Bow-

man presented no evidence directly connecting Kiger to Rumfelt's murder. Unlike in *Barriner*, here there is no physical evidence linking Kiger to Rumfelt's murder. No witnesses observed Rumfelt in Kiger's company at any time near her time of death. As such, the evidence pertaining to Kiger's potential involvement in Rumfelt's murder is not admissible alternative perpetrator evidence under the analysis employed in *Barriner*.

The alternative perpetrator evidence in this case is more analogous to *State v. Rousan*, 961 S.W.2d 831 (Mo. banc 1998), and *State v. Chaney*, 967 S.W.2d 47 (Mo. banc 1998). In *Rousan*, the defendant sought to introduce evidence that another person had motive to commit the murder and had been considered a suspect by law enforcement. *Id.* at 848. The fact that another person had motive and was, at one time, a suspect in the case did not constitute a direct connection between the alleged alternate perpetrator and the murder. The alternate perpetrator evidence was inadmissible because evidence of an opportunity to commit the crime does not establish a direct connection. *Id.*

In *Chaney*, the defendant, who was accused of killing a child, sought to introduce evidence that a known pedophile was the real perpetrator. 967 S.W.2d at 54. The defendant introduced evidence that the pedophile lived near the victim and had lied to police regarding where he was when the murder was committed. *Id.* at 55. The trial court did not err in excluding the evidence because it did not establish a direct connection between the alleged alternate perpetrator and the murder. *Id.*

As in *Rousan* and *Chaney*, the fact that Kiger was investigated as a suspect and may have had an opportunity to murder Rumfelt does not establish the requisite direct connection to her death. The trial court did not err in excluding Bowman's evidence that Kiger was the perpetrator.

### 3. Sufficiency of the evidence

 Bowman asserts the trial court erred in overruling his motion for judgment of acquittal because there was insufficient evidence that Bowman killed Rumfelt. Appellate review of a sufficiency of the evidence claim "is limited to determining whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Crawford*, 68 S.W.3d 406, 408 (Mo. banc 2002). The evidence is reviewed in the light most favorable to the verdict. *State v. Langdon*, 110 S.W.3d 807, 811 (Mo. banc 2003). The evidence and inferences supporting the conviction are accepted as true and all contrary evidence and inferences are disregarded "unless they are such a natural and logical extension of the evidence that a reasonable juror would be unable to disregard them." *State v. Grim*, 854 S.W.2d 403, 411 (Mo. banc 1993).

There are at least five evidentiary facts that support the jury's determination that Bowman murdered Rumfelt. First, Bowman's semen was found on the inside of Rumfelt's underwear. This evidence demonstrates that Bowman had physical contact with Rumfelt and supports a reasonable inference that Bowman and Rumfelt engaged in a sexual encounter.

Second, none of Rumfelt's family or friends knew Bowman. This supports the reasonable inference Bowman's first contact with Rumfelt occurred during the sexual encounter.

Third, Rumfelt had been strangled, her shirt pulled up, her bra stuffed in her mouth, and her body dumped in a hidden and relatively remote location. The St. Louis County medical examiner testified that this evidence, in conjunction with the

DNA evidence, indicates that Rumfelt was the victim of a sexual assault.

Fourth, a witness testified that she observed Rumfelt walking with an unknown man at approximately 10:30 p.m. June 5, 1977. The witness testified that she approached Rumfelt to speak with her but the man pulled Rumfelt closer and walked away. After being shown a photo lineup, the witness identified Bowman as the man who was walking with Rumfelt.

Finally, the evidence showed that Rumfelt died between 1 a.m. and 4 a.m. on June 6, 1977. This evidence supports a reasonable inference that Rumfelt was killed just hours after being seen walking with Bowman.

In sum, the location and statistical match of the DNA evidence, together with the other evidence favorable to the verdict, show that a reasonable juror could have found guilt beyond a reasonable doubt. The trial court did not err in overruling Bowman's motion for a judgment of acquittal.

### 4. *DNA test results*

■■■ Bowman argues that the trial court erred in allowing Dr. Margaret Walsh of the St. Louis County police crime laboratory to testify regarding the DNA evidence because the State failed to establish a reliable chain of custody. Specifically, Bowman argues that there was inadequate evidence that the underwear Dr. Walsh tested was not tampered with or damaged.

■■■ The determination of whether a sufficient chain of custody has been established for the admission of an exhibit is a matter within the sound discretion of the trial court. *State v. Nicklasson*, 967 S.W.2d 596, 617 (Mo. banc 1998). To admit exhibits and testimony regarding tests performed on those exhibits, the trial court must be satisfied as to the identity of the exhibits and that the exhibits were in the same condition when tested as when the exhibits were originally obtained. *State v. Mahan*, 971 S.W.2d 307, 317 (Mo. banc 1998); *State v. Strughold*, 973 S.W.2d 876, 886 (Mo.App.1998). This may be proven by evidence establishing a chain of custody, but proof of a chain of custody does not require proof of hand-to-hand custody of the evidence nor proof that eliminates all possibility that the evidence has been disturbed. *Mahan*, 971 S.W.2d at 317. The trial court may assume, absent a showing of bad faith or tampering, that officials having custody of exhibits properly discharged their duties and that no tampering occurred. *Id.*; *United States v. Gatewood*, 786 F.2d 821, 825 (8th Cir.1986).[3] However, when an exhibit is identified positively at trial, chain of custody evidence no longer is required to prove that an item produced at trial is the item taken into custody as evidence. *State v. Gott*, 191 S.W.3d 113, 117 (Mo.App.2006); *State v. Sammons*, 93 S.W.3d 808, 810 (Mo.App.2002). Any weaknesses in a witness's visual identification is a proper subject of cross-examination and may be considered by the jury in assessing the weight of the evidence. *Gott*, 191 S.W.3d at 117.

In this case, the visual identification of the underwear was sufficient to support the trial court's admission of the evidence. Dr. Walsh first opened the sealed box

---

**3.** In *Gatewood,* the court stated that if the defendant makes "minimal" showing of bad faith or tampering, then the government must establish that "precautions were taken to maintain the evidence in its original state." 786 F.2d at 825. However, this aspect of the *Gatewood* test for admissibility is inapplicable here because of the positive visual identification made by the witnesses. As such, Bowman's arguments go to the weight of the evidence, not its admissibility.

containing the underwear when it arrived at the testing laboratory. Detective Gregory Moore testified that the underwear were the "the panties worn by the victim, I remember the brown lace trim." Detective Moore also testified that the underwear was in substantially the same condition as when he observed them at the crime scene. Dr. William Drake testified that, based upon the autopsy photos, the underwear that Dr. Walsh tested appeared to be the same that were worn by the victim. The visual identification of the underwear by Detective Moore and Dr. Walsh was sufficient to admit the underwear into evidence. The trial court did not err in overruling Bowman's objection to the admissibility of the evidence.

5. *Unidentified Slides*

■ Bowman argues that the trial court erred by not allowing defense counsel to cross-examine Dr. Walsh about two unidentified vaginal slides. According to Bowman's offer of proof, Officer Joseph Burgoon delivered the slides to Dr. Walsh for testing and he believed the slides may have been created during Rumfelt's autopsy. The offer of proof also indicated that the slides were tested and the results excluded both Bowman and Rumfelt as contributors of the material on the slides. The trial court sustained the State's objection to Bowman's attempt to cross-examine Dr. Walsh regarding how the slides were included in the Rumfelt evidence file. The court concluded that Dr. Walsh could testify only as to what Burgoon had told her and, therefore, could offer only inadmissible hearsay testimony.

Hearsay is an "out-of-court statement that is used to prove the truth of the matter asserted and that depends on the veracity of the statement for its value." *State v. Kemp*, 212 S.W.3d 135, 146 (Mo. banc 2007). The trial court was correct to conclude that if Dr. Walsh had testified concerning what Burgoon told her about the acquisition of the slides, the testimony would have been hearsay. Additionally, Bowman could have questioned officer Burgoon at trial because, after the trial court sustained the State's objection to Bowman's cross-examination of Dr. Walsh, the State indicated that Burgoon was available to testify. Bowman declined to examine officer Burgoon regarding the slides. There was no error.

6. *Sexual Assault Evidence*

■ Bowman argues that the trial court erred in allowing the St. Louis County medical examiner, Dr. Mary Case, to testify that Rumfelt was the victim of a "probable sexual assault." Specifically, Bowman asserts that Dr. Case did not state that her conclusion reflected a reasonable degree of scientific certainty.

■ Generally, it is within the trial court's sound discretion to admit or exclude an expert's testimony. *Johnson v. State*, 58 S.W.3d 496, 499 (Mo. banc 2001). Expert testimony is admissible when the subject of the testimony is one on which the jurors otherwise would be incapable of drawing a proper conclusion from the facts in evidence. *State v. Calhoun*, 259 S.W.3d 53, 58 (Mo.App.2008). The expert testimony must assist the jury and must not divert the jury's attention unnecessarily from the relevant issues. *State v. Wright*, 247 S.W.3d 161, 165, 166 (Mo.App.2008) (citing *State v. Taylor*, 663 S.W.2d 235, 239 (Mo. banc 1984)). The fact that an expert does not testify that his or her opinion is to "a reasonable degree of scientific certainty" does not render the testimony inadmissible. *State v. Buchli*, 152 S.W.3d 289, 297 (Mo.App.2004), citing *Bynote v. National Super Markets, Inc.*, 891 S.W.2d 117, 125 (Mo. banc 1995). It is sufficient that the expert establishes that his or her

opinion was based on reasonable certainty and not on speculation. *Id.*

Dr. Case testified that Rumfelt died from strangulation and was likely the victim of a probable sexual assault because her body was found in an isolated area, her bra was removed and stuffed in her mouth, and she had been strangled and stabbed. Dr. Case testified that in her experience as a forensic pathologist, these are indicators of sexual assault. Dr. Case's testimony addressed a subject about which the jurors lacked experience or knowledge and thereby assisted them in their deliberations. The trial court did not abuse its discretion in allowing Dr. Case to testify that Rumfelt was the victim of a probable sexual assault.

Bowman has not established error in the guilt phase. The judgment as to guilt is affirmed.

## II. *Penalty Phase*

■ Bowman raises two points of error pertaining to the penalty phase. First, he asserts that the trial court erred by allowing the State to introduce excessive victim impact evidence. Second, he asserts the trial court erred in overruling his motion to preclude the death penalty as disproportionate. The first point is dispositive. Therefore, Bowman's second point will not be addressed.

The State was permitted, over Bowman's objection, to present evidence that Bowman was convicted in Illinois for murdering Elizabeth West and Ruth Ann Jany. Prior to trial, Bowman's murder convictions in the West and Jany cases were reversed and vacated. Bowman objected to evidence of his prior convictions, as well as the evidence of other convictions and unadjudicated bad acts, on grounds that the evidence was excessive victim impact evidence under *Payne v. Tennessee*, 501

U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

■ During the penalty phase, both the state and the defense may introduce any evidence pertaining to the defendant's character, including evidence detailing the circumstances of prior convictions, evidence of a defendant's prior unadjudicated criminal conduct, and evidence of the defendant's conduct that occurred subsequent to the crime being adjudicated. *State v. Cole,* 71 S.W.3d 163, 174 (Mo. banc 2002). "The trial court has broad discretion during the penalty phase to admit any evidence it deems helpful to the jury in assessing punishment." *Gill v. State,* 300 S.W.3d 225, 232 (Mo. banc 2009). The trial court's decision in these matters will be overturned only if there is a showing of an abuse of that discretion. *State v. Strong,* 142 S.W.3d 702, 710 (Mo. banc 2004). Reversal is warranted only if the error was "so prejudicial that it deprived the defendant of a fair trial." *Id.*

In *Johnson v. Mississippi,* 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), the United States Supreme Court held that the reversal of a prior conviction that the jury considered in imposing the death penalty undermines the validity of the sentence. During sentencing in that case, the prosecution introduced evidence of the defendant's prior felony conviction to persuade the jury to impose a death sentence, but the prior conviction was later vacated. The Supreme Court explained that "the reversal of the conviction deprive[d] the prosecutor's ... evidence of any relevance to Mississippi's sentencing decision." *Id.* The decision to impose death cannot be based on factors irrelevant to the sentencing process. *Id.*

In *State v. McFadden,* 216 S.W.3d 673 (Mo. banc 2007), this Court employed the principles outlined in *Johnson* to reverse a death sentence because two of the six ag-

gravating factors found by the jury consisted of the defendant's vacated murder conviction and death sentence in an unrelated case. *Id.* at 678. Specifically, reversal was required because even if the State's evidence regarding the underlying facts of the McFadden's vacated conviction and sentence was properly admissible as non-statutory aggravating prior bad acts, the court could not "assume that the jury's weighing process and sense of responsibility were unaffected by its knowledge that McFadden was already sentenced to death."

This case is similar to *McFadden.* In Bowman's case, as in *McFadden,* the jury found six aggravating circumstances, two of which related to vacated murder convictions. The State argues that evidence of Bowman's vacated convictions is admissible as unadjudicated prior bad acts, also referred to as non-statutory aggravating circumstances. Consistent with *McFadden,* this argument must be rejected because "when the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale." *Id.* at 678, quoting *Stringer v. Black,* 503 U.S. 222, 232, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). Even if the prosecution's evidence regarding the underlying facts of Bowman's two prior murder convictions were properly admissible as non-statutory aggravating prior bad acts, the Court cannot assume that the jury's weighing process and sense of responsibility were unaffected by its knowledge that Bowman previously had been convicted of

two murders. A sentence resting on invalid sentencing factors is invalid.

Bowman's death sentence is reversed. The judgment in all other respects is affirmed. The case is remanded.

PRICE, C.J., RUSSELL, BRECKENRIDGE, FISCHER and STITH, JJ., concur; WOLFF, J., concurs in part and dissents in part in separate opinion filed; STITH, J., concurs in opinion of WOLFF, J.

MICHAEL A. WOLFF, Judge.

Gregory Bowman entered an *Alford* plea[1] in Illinois in 1979 to charges of murdering two young women who had been abducted and strangled. One woman's body was discovered in a wooded creek area near Belleville; she had been strangled with her bra strap. The other woman's body was discovered in a rural area near Belleville; she had been choked with a halter top. In the plea hearing, Bowman refused to admit that he committed the murders; he was sentenced to life in prison.

Some 20 years after being sentenced to life in prison, the Illinois circuit court in Belleville held a hearing in which the court determined that Bowman's admission to police that he had murdered the two women were involuntary, the result of a bizarre scheme concocted by a deputy sheriff and a jailhouse "snitch" to trick Bowman—who was in jail on another charge and was about to be sent to a state prison—into admitting to the murders as a way of staying in the Belleville jail from which the snitch would help him to escape.[2]

---

1. Bowman's plea admitted that the state had evidence of his guilt, but he refused to concede that he was in fact guilty—a plea recognized in *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). Bowman entered the plea to avoid a death sen-

tence. *People v. Bowman,* 335 Ill.App.3d 1142, 270 Ill.Dec. 139, 782 N.E.2d 333, 336 (2002)

2. Bowman's motion for post-conviction relief in Illinois was filed in 1999 after he learned of

The circuit court's order granting Bowman a new trial was affirmed on appeal in 2002. *Bowman*, 270 Ill.Dec. 139, 782 N.E.2d 333. He remained in jail, awaiting the new trial, until he was released when he made bail in 2007.

A few days later he was arrested and charged in this case with the 1977 murder of Velda Rumfelt, whose body was found in a remote wooded area of St. Louis County with her throat slit, ligature marks on her neck from two shoe strings and her bra stuffed in her mouth.

After Bowman was tried, convicted and sentenced in this case in 2009 for the murder of Rumfelt, the state of Illinois did not pursue a new trial in Belleville for the two murders for which Bowman previously had been sentenced.

While I agree with the principal opinion that Bowman's death sentence rests on invalid sentencing factors—the convictions in Illinois that have been vacated—I am left with a troubling question:

Was Gregory Bowman a serial murderer in the 1970s, or is he a man who has been convicted wrongly of murder of three young women in two trials in two states?

The problem in this case is simply that the strength of the evidence as to Bowman's guilt is "not of the compelling nature usually found in cases where the sentence is death." *State v. Chaney*, 967 S.W.2d 47, 60 (Mo. banc 1998). There is sufficient evidence in this case to convict him of the murder of Velda Rumfelt, but the evidence is meager and not at all compelling.

## This Court's Duty Independently to Review the Strength of Evidence

The statute in effect in 1977, when Velda Rumfelt was murdered, did not require an independent review, but as amended in 1984, section 565.035 requires this Court to conduct an independent review of every case where the death penalty is imposed. In conducting its independent review, one of the responsibilities of the Court is to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant." Section 565.035.3(3), RSMo 2000.

The state, however, argues that this Court should not consider the strength of the evidence, because "the strength of the evidence" language was not a part of the statutory scheme at the time of the victim's murder. *See* section 565.014.3(3), RSMo Supp.1977 (requiring the Court to consider "the crime and the defendant" only). The state notes that section 565.001.2, RSMo 2000, provides that the provisions of the chapter "shall not govern the construction or procedures for charging, trial, punishment or appellate review of any offense committed before the effective date of [the] chapter." The effective date of the chapter was October 1, 1984. The offense in this case occurred in June 1977. But while section 565.014.3(3), RSMo Supp.1977, requires the Court to consider "the crime and the defendant," it does not prevent this Court from considering the strength of the evidence supporting the jury's conclusion that Bowman committed Rumfelt's murder.

This Court has considered the strength of the evidence for offenses that occurred prior to 1984, even though the statute in effect at the time of the crimes did not require an independent review. In *State*

---

the scheme to trick him into confessing from an article in the St. Louis Post–Dispatch. *Bowman*, 270 Ill.Dec. 139, 782 N.E.2d at 337.

*See* Carolyn Tuft & Bill Smith, *Deputy Admits Tricking Convict into Confessing*, St. Louis Post-Dispatch, Feb. 22, 1999, at A1.

*v. Franklin*, 969 S.W.2d 743, 746 (Mo. banc 1998), the Court found that the death penalty was "neither excessive nor disproportionate in light of the crime and the strength of the evidence against him" for a murder that occurred in 1977. *Id.* at 745. Similarly, in *State v. Bannister*, 680 S.W.2d 141, 143, 149 (Mo. banc 1984), the Court found that a sentence of death for the murder of the victim in 1982 was "not excessive or disproportionate to the penalty imposed in similar cases considering the crime, the defendant, and the strength of the evidence."

This Court's "duty to assess the strength of the evidence is an ongoing duty." *State ex rel. Amrine v. Roper*, 102 S.W.3d 541, 550 (Mo. banc 2003) (Wolff, J., concurring); *see id.* at 547 (majority). *See also id.* at 552 (Price, J., dissenting) (acknowledging that determining whether the "death penalty is excessive or is disproportionate considering, among other things, 'the strength of the evidence' . . . is a continuing duty that must be addressed in light of new evidence"). The reason the Court applies the current version of the statute is that the purpose of section 565.035.3 "is to avoid wrongful convictions and executions." *Id.* at 547 (majority). Choosing not to review the strength of the evidence for offenses that occurred prior to 1984 may allow wrongful convictions to proceed and innocent persons to be executed.

In addition, failure to review the strength of the evidence in these convictions would result in a review regimen that is arbitrary and capricious. Defendants accused of committing offenses prior to 1984 could be executed where the evidence is weak, while defendants who commit later offenses, where the evidence is similarly weak, would be spared from the death penalty by the application of the later statute. Such a statutory scheme would not survive an Eighth Amendment challenge. This Court undoubtedly has a duty to review the strength of the evidence against Bowman.

**Strength of the Evidence**

This Court is required to determine whether sufficient evidence exists to support a conviction by reviewing the evidence in the light most favorable to the jury's decision, as the principal opinion correctly notes. *State v. Langdon*, 110 S.W.3d 807, 811 (Mo. banc 2003). This general rule does not apply, however, when this Court reviews a sentence of death; section 565.035.3 requires this Court *independently* to assess the strength of the evidence against the defendant in assessing whether a sentence of death is warranted.

In this case, the primary evidence relied on by the state—and, undoubtedly, the jury—to convict Bowman was the presence of his DNA profile in what was alleged to be the victim's underwear. While the DNA may be sufficient to sustain Bowman's conviction, it is insufficient to sustain a sentence of death.[3]

---

**3.** Every prosecutor wishes to have a "smoking gun" to use against a defendant. In today's world, the "smoking gun" that jurors wish to see—and, therefore, may place undue weight on—is DNA evidence. In today's world, the " 'so-called CSI effect,' where television shows cause jurors to expect and almost demand forensic evidence at trial before they will vote to convict, also may cause jurors to place undue weight on DNA evidence." Brooke G. Malcolm, *Convictions*

*Predicated on DNA Evidence Alone: How Reliable Evidence Became Infallible*, 38 CUMB. L. REV. 313, 324 (2008). Juries and courts, including this Court, also may be unduly persuaded by DNA evidence that indicates the defendant is responsible for the crime. Courts must take care to assure that proponents of DNA evidence properly have preserved the evidentiary material and followed correct procedures in doing the testing.

The story of how Bowman came to be charged with the murder of Velda Rumfélt is telling. Following his *Alford* plea, Bowman was convicted in 1979 of the murders of two young women in Illinois. The convictions were based on his confessions to a jailhouse snitch, which, some 20 years later, an Illinois circuit court found to have been involuntary, the result of the bizarre scheme concocted by a deputy sheriff and a jailhouse snitch whom the deputy sheriff considered to be a "con artist." The Illinois appeals court upheld the circuit court's conclusion that Bowman had been conned and affirmed the order granting a new trial. *Bowman*, 270 Ill.Dec. 139, 782 N.E.2d 333.[4]

After some years in jail awaiting a new trial, Bowman posted bail with the Illinois circuit court in January 2007. Within days of his release, on January 30, 2007, a Belleville police detective called the St. Louis County police department and spoke with a St. Louis County police detective. The St. Louis County police detective's report says that the Belleville police detective advised him that "he was investigating a suspect who had just been released from custody after his conviction, [sic] was vacated in St. Clair County, Il after serving nearly 30 years for the murders of two young females." The Belleville police detective asked whether St. Louis County had any open homicides of young females that had occurred in 1977 or 1978. The Belleville police detective was informed of Velda Rumfelt's homicide and that DNA evidence was available. The Belleville police detective then forwarded Bowman's

DNA profile to Dr. Margaret Walsh[5] to test against the DNA found in Rumfelt's alleged underwear. Bowman was arrested on a St. Louis County warrant fewer than three days later, on February 2, 2007.

When Bowman was released on bail, police undoubtedly believed a murderer of two young women was walking around Belleville, free to do as he pleased, pending his new trial. But within 72 hours of the Belleville police contacting the St. Louis County police department, Bowman was once again behind bars. With Bowman in jail in St. Louis County, the state of Illinois was relieved of the problem of providing him a new trial in the 1979 case, provided that Bowman be convicted of the 1977 murder of Velda Rumfelt in Missouri.

This solution to the Illinois problem—how to re-try Bowman—seems almost too good to be true. Life teaches, of course, that when something is almost too good to be true, it often is not true.

There is a problem with the DNA evidence in this case and an even bigger problem with the "eyewitness" identification used to bolster the case against Bowman.

### The DNA evidence

The evidence in the Velda Rumfelt killing was placed in a "sealed" box in 1977 and allegedly stored for more than 30 years before it was compared with Bowman's DNA. For at least part of those 30 years, it was stored at St. Louis County health department's Murphy Health Center in Pine Lawn.[6] At some time in the

---

4. The appellate court also upheld some monetary sanctions the circuit court had imposed on the state's attorney's office for its conduct leading up to the post-conviction hearing. *Bowman*, 270 Ill.Dec. 139, 782 N.E.2d at 343–44.

5. Dr. Walsh, a forensic scientist, originally had tested the clothing in the Rumfelt evi-

dence box in 2006 as part of a federal grant to St. Louis County for the review of unsolved homicides. She developed a DNA profile from the sperm fraction contained on the underwear in the box.

6. The Murphy Health Center is currently in Berkeley, and the North Central Community Health Center is in Pine Lawn. Health and

1980s, however, the facility where the evidence box was stored was flooded. It is unclear what effect this had on the evidence box. But what is clear is that items were missing from the box—including a slide with semen specimens from the autopsy of Rumfelt's body—that should have been in the box.

Dr. William Drake, who performed the autopsy on Rumfelt's body in 1977, testified that he was able to obtain a vaginal smear containing sperm from her body. This smear was placed on a slide. That slide is nowhere to be found. However, two unidentified vaginal slides that were labeled by their case numbers as having to do with Rumfelt's case did not contain the DNA of either Bowman or Rumfelt. They were labeled with two women's names—names that Dr. Drake did not know.[7] The autopsy report also indicated that five hair samples had been taken from Rumfelt's body. None of these hair samples were in the box when it was opened 30 years later. To say that the evidence was stored in a "sealed" evidence box raises a serious question of the meaning of the word "sealed." Whatever "sealed" may mean, it seems evident that, whether purposely or inadvertently, the evidence box must have been tampered with, and, in any event, crucial evidence was missing.

### The "eyewitness" identification

A witness, a school classmate of Rumfelt's, identified Bowman in 2007 as a person the witness had seen with Rumfelt shortly before her death in 1977. When talking with the police in 1977 a few days after Rumfelt's death, the witness reported that she had seen Rumfelt with a young man at approximately 10:30 p.m. on June 5, 1977, near the intersection of Brentwood Boulevard and White Avenue in the St. Louis County suburb of Brentwood. She described the young man as a white male, approximately 20 years old with shoulder-length blond hair and approximately 6-feet tall with a slender build.

After the DNA match to Bowman in 2007, the police brought the witness a picture of a 1977 lineup in which Bowman appears with five other young white men. Bowman is Number 6. Initially the witness said that Number 4's hair looked like the man she had seen. She then identified Number 6, because the face "jumped out at [her] for some reason" and "the rest of them didn't, but I thought the hair was not quite right." She also stated that his build and "slim hips" were what seemed correct.

Her testimony at Bowman's trial, two years after her identification and 32 years after the murder, was that maybe the hair had not been blond as she had told the police in 1977; instead, she testified that it could have been a little darker and maybe it was not blond after all. Her trial testimony was that she had seen Rumfelt and the man from the front in 1977. On cross-

Wellness, County Health Center Services, St. Louis County, Missouri, *available at* http://www.stlouisco.com/HealthandWellness/HealthCentersandMedicalServices/CountyHealthCenters (last visited March 30, 2011).

The testimony at trial was that the center was in Pine Lawn when it flooded. I do not know whether the Murphy Health Center has moved since its flood in the 1980s or whether it was actually in Berkeley at the time of the flood. More importantly, it is unclear from the record why criminal evidence was being stored at a center for the health department rather than in a law enforcement facility.

7. As discussed in the principal opinion, the unidentified slides were not admitted into evidence on the basis of hearsay. The state offered to make the relevant witness available to testify, but the defense never called him. Most of the information contained here was given by Dr. Walsh in an offer of proof. Dr. Drake testified in the presence of the jury that he did not know the names that were on the two slides.

examination, however, she admitted that if the 1977 police report stated nothing about seeing them from the front, then she actually might not have seen them from the front.

The reason the witness seems to be confused can be discerned from reviewing the evidence in the record of the photo lineup. Number 4, the person the witness initially identified, is the only person in the lineup with shoulder-length hair. He is one of only two men in the lineup with blond hair, and he is the blonder of those two. Bowman, Number 6, has brown hair that goes just past his ears. Bowman is the most slender of the six, although not by much. Unfortunately for him, the fact that he was the most slender man in the lineup may have been the sole reason that the witness identified him in 2007.

Eyewitness identification often is inherently questionable, especially when it is based on a brief look some 32 years in the past.[8] In one study of more than 100 innocent persons who were convicted wrongly, researchers found that more than 75 percent were victims of mistaken eyewitness identification.[9]

This case shows how eyewitness testimony can be used inappropriately. The witness in this case gave a fairly generic description of the man she saw in 1977: white, 20 years old, shoulder-length blond hair, 6–feet tall and a slender build. Thirty years later, in 2007, she was shown a photo of a police lineup. She initially noted that one man's hair seemed to look like the man she remembered, but then she changed her mind and noted that another man's face stuck out in her memory. More than anything, though, the second man was very slender, so she assumed that must be the right one.

The man she identified was Gregory Bowman. His hair was not exactly blond as she had described 30 years ago, but, nevertheless, his slender appearance and his face seemed vaguely familiar.[10] Two years later, testifying at Bowman's trial, the prosecutor helped her out, asking her, "could [his hair] have been a little darker?" She responded: "It could have been a little darker. I can't be positive on the color." Eyewitnesses—or any person, for that matter—rarely can be positive about anything, but certainty is implausible 30 years after a brief observation.

A witness may be sincere in his or her belief, but sincerity does not assure accuracy. An eyewitness's identification 30 years after the crime occurred is not useful, especially when the only other evidence available is tainted DNA evidence and when the defendant is given a sentence of death.

### Evidence of another "prime suspect"

Kevin Kiger, considered a "prime suspect" in Rumfelt's death as well as a suspect in the 1977 deaths of two other young women in the St. Louis area in 1980, actually matched the description the witness gave in 1977. Kiger was convicted of mur-

---

8. *See generally* Gary L. Wells & Elizabeth A. Olsen, *Eyewitness Testimony*, 54 ANNU. REV. PSYCHOL. 277, 278 (2003) (reviewing recent studies on eyewitness identifications and noting the "surprisingly high" number of misidentifications that occur).

9. *Id.*

10. Wells and Olsen note many of the problems that occur with lineup identification. For example, they note that if the actual culprit is not in the lineup, witnesses will tend to choose the person who looks the most like the culprit rather than state that the person is not present. *Id.* at 286. Similarly, the lineup should be chosen so that a person is not identified simply because they "stand[ ] out" or jump out at the witness as occurred in Bowman's case. *Id.* at 287.

dering another young woman by slitting her throat, but the circuit court refused to admit evidence as to Kiger in Bowman's case.[11] Bowman's offer of proof offered at trial showed that at the time of Rumfelt's death, Kiger matched the description the witness gave in 1977—he had a "slim build, probably 150 to 170 pounds, around six foot, blonde hair, kind of shoulder-length long, shaggy, kind of curly, wavy hair."

The offer of proof also asserted that:

(1) Kiger was fired June 6, 1977—either the day Rumfelt went missing or the day after she was murdered.[12]

(2) Kiger not only was familiar with the Greensfelder Park area in west St. Louis County but also had visited the park with his girlfriend around the time Rumfelt was murdered. The park was less than one-fourth of a mile from where Rumfelt was found. There was no evidence that Bowman had any familiarity with the Greensfelder Park area.

(3) Kiger's girlfriend was missing a knife similar to the weapon used to kill Rumfelt.

(4) A box of matches was found at the scene of Rumfelt's murder. When Kiger smoked, he only used matches.

(5) Kiger liked to collect keys, and the only item missing from Rumfelt's person was her key ring.

(6) Kiger knew Rumfelt and would come to the store where she worked and ask her out on dates, according to one of the investigating detectives. Rumfelt's classmates told the detective that Rumfelt would refuse to go out with Kiger and that she was afraid of him. But when the detective contacted Kiger in prison to advise him that he was a suspect in Rumfelt's murder, Kiger denied knowing her.

Evidence that another person may have committed the crime generally is excluded, in a trial court's discretion, unless the evidence shows directly that the other person committed the crime. Evidence that only shows that another person had opportunity or motive to commit the offense or evidence that is "otherwise disconnected or remote (and there is no evidence that the other person committed an act directly connected to the offense)" usually is excluded because "the minimal probative value of the evidence is outweighed by its tendency to confuse or misdirect the jury." *State v. Barriner*, 111 S.W.3d 396, 400 (Mo. banc 2003). Although a jury may be misled by such evidence—which is the reason for excluding such evidence at trial—this Court should consider evidence that another person may have committed the crime in reviewing the strength of the evidence in a death penalty case under section 565.035.

In this case, the evidence implicating Kiger is especially strong considering how little evidence the state had to connect Bowman with Rumfelt's murder. Kiger matched the description of the eyewitness who saw Rumfelt walking with a man on June 5. He had motive and opportunity to commit the crime—as indicated by the police's decision to classify him as a "prime suspect" in the case. He knew Rumfelt and asked her out on dates, which she refused, but when interviewed about the murder, he told the police he did know her. Kiger was familiar with the area of Greensfelder Park where Rumfelt's body

---

11. Kiger currently is serving a life sentence.

12. The autopsy results showed that Rumfelt died the night of June 5 or in the early morn-ing hours of June 6. However, a classmate of Rumfelt claimed that she saw Rumfelt June 6 around 11:30 a.m.

was found; no evidence indicates Bowman knew the area or ever had been there. The one item missing from Rumfelt's person was a key ring, and Kiger liked to collect keys. Finally, a knife, which could have been the murder weapon, was missing from Kiger's girlfriend's apartment.

The power and the danger of trial court discretion are on display in this case. Where there is discretion to exclude evidence, as the trial court did in this case, there is discretion for a trial court to admit the evidence. It is more than idle speculation to acknowledge the strong possibility that Bowman may have been acquitted in a trial conducted by a trial court that exercised discretion to let the jury hear this evidence. Under the current law of evidence in Missouri, the trial court's ruling is reviewed for abuse of discretion, a standard that may enhance the possibility of a wrongful conviction.[13] That is a feature of our criminal justice system that is difficult to accept, but it is a system operated by human beings who are capable of making wrong decisions.

While the courts acknowledge the possibility of mistakes, when death is the punishment, the law demands an *independent* review. In *State v. Chaney,* this Court reduced the defendant's sentence of death to a sentence of life imprisonment because it found that while the evidence "was sufficient to support a conviction," it was "not of the compelling nature usually found in cases where the sentence is death." *Chaney,* 967 S.W.2d at 60. The evidence of Chaney's guilt, however, may be stronger than the evidence of Bowman's.

The victim in *Chaney* was a friend of Chaney's stepdaughter and had been visiting Chaney's house prior to the victim's disappearance. *Id.* at 49–50. The evidence included the presence of material on the victim similar to that found in Chaney's van despite the fact that Chaney said that the victim had not been in the van for more than a year. *Id.* at 51. The state's forensic analyst testified that the victim would have had to have been lying down in the back of the van to pick up the amount of material her clothing contained and that the likelihood that the combina-

---

**13.** This Court does not have the authority to promulgate rules of evidence, Mo. Const. art. V, sec. 5, so the evidentiary principles courts apply come from statutes, the common law and the constitution. *State v. Walkup,* 220 S.W.3d 748, 756–57 (Mo. banc 2007) (citing JOHN C. O'BRIEN, MISSOURI LAW OF EVIDENCE sec. 1–1 (4th ed.2002); WILLIAM SCHROEDER, MISSOURI PRACTICE V. 22, MISSOURI EVIDENCE sec. 101.1 (2nd ed.1999)). Perhaps because of the constitutional prohibition against having evidentiary "rules," the common law principles are expressed in terms of trial court discretion. The standard is used even when there is a clear statutory standard. *See Kivland v. Columbia Orthopaedic Group,* 331 S.W.3d 299, 311 (Mo. banc 2011) ("An abuse of discretion occurs if the court erroneously finds that the requirements of the expert witness statute are not met.") The common law standard applicable in this case is relevancy, under which trial judges are given the broadest range of discretion to determine what evidence will tend to prove or disprove an ele-

ment of an offense or a defense. The principle applicable to this case is set forth in SCHROEDER, *Evidence That Someone Other Than Defendant Committed the Crime With which Defendant is Charged,* sec. 401.3.5 ("Evidence that another person had an opportunity to commit the crime with which the defendant is charged is not admissible without proof that the other person committed some act directly connecting him with the crime."). Discretion is key even when the principle is stated so exactly because what evidence shows a direct connection is a judgment call left largely to the trial judge. If the trial judge had ruled prior to trial that the facts as to Kiger were admissible, even in the unlikely event the prosecutor received intermediate appellate review, there probably is no chance that the judge's ruling would be reversed. That is what "discretion" means on nearly all questions of relevancy—the trial judge's ruling stands regardless of whether the evidence is admitted or not admitted.

tion of materials found on the victim's clothing could have come from anywhere other than Chaney's van was " 'so unlikely it's astronomical.' " *Id.* at 51–52. In addition, hair samples that were indistinguishable from Chaney's were found on the victim and hairs matching the victim's genetic profile were found in the van. *Id.* at 52. DNA testing indicated that less than 0.5 percent of the population could match the hairs found in the van. *Id.* The other evidence against Chaney was that a tool consistent with the victim's injuries—which was possibly the murder weapon—was found in a toolbox inside the van and that Chaney had tried to remove the toolbox prior to the police search of the van. *Id.* at 51. Finally, Chaney's statements to the police about the night of the murder contained numerous inconsistencies, Chaney was absent from home the night of the murder and Chaney was familiar with the area where the victim was found. *Id.* at 53.

This Court overturned Chaney's death sentence despite the substantial physical evidence against him, including the hair and fiber samples found on the victim and in Chaney's van and the probable murder weapon found in the van, which Chaney tried to remove before the police could search the van. This Court did not think the evidence was "compelling" enough to support a sentence of death.

In this case, the state urges that the evidence is "compelling" simply because DNA evidence was found in the victim's alleged underwear. But the crucial DNA material in this case, taken from Rumfelt's vagina in the autopsy, has disappeared. The physical evidence that was presented at trial was in a "sealed" box that was in a flood and that obviously had been opened and tampered with—and from which some evidence had been removed. There also was some material produced—two vaginal slides—that apparently had nothing to do with the Rumfelt killing 30 some years ago. All of the circumstances of this case—and especially the scant DNA evidence and the useless eyewitness identification—show that the strength of the evidence is not compelling enough to support a sentence of death.

### Conclusion

I agree with the principal opinion that the death sentence rests on invalid sentencing factors. I also agree, reluctantly, that there is sufficient evidence to uphold the jury's verdict that Bowman is guilty. However, the weakness of the evidence should be assessed against the finality of the ultimate penalty, a sentence of death.

I would not remand the case for a new penalty phase trial but rather, under section 565.035.5(2), would sentence Bowman to life in prison without eligibility for parole, probation or release except by act of the governor. Someday the state may find out who killed Velda Rumfelt if it is someone other than Bowman. If that happens, it will be better if the state has not already executed Gregory Bowman.